In re LOMBARD–WALL,
INCORPORATED,
Debtor.

LOMBARD–WALL INCORPORATED,
as Debtor-in-Possession, Plaintiff,

v.

NEW YORK CITY HOUSING DEVEL-
OPMENT CORPORATION, Defendant.

Bankruptcy No. 82 B 11556 (EJR).
Adv. No. 83–6014A.

United States Bankruptcy Court,
S.D. New York.

Dec. 12, 1984.

Cadwalader, Wickersham & Taft, by Edwin David Robertson, New York City, for plaintiff Lombard-Wall, Inc.,

Skadden, Arps, Slate, Meagher & Flom, by Dennis J. Drebsky, New York City, for defendant New York City Housing Development Corp.

OPINION AND REPORT ON ORDER
AND REFERENCE DATED
JANUARY 20, 1984

EDWARD J. RYAN, Bankruptcy Judge.

By order of January 20, 1984 the undersigned Bankruptcy Judge was directed by Judge Gerard L. Goettel to hear and report upon the defendant's motion to withdraw the reference from the bankruptcy court and upon the demand for a jury trial in the district court.

The order defined the critical issues of this case as (1) whether the disputes presented by the complaint involve issues arising under the Bankruptcy Code and thereby properly within the jurisdiction of the bankruptcy court; and (2) whether prior actions taken by HDC amount to a consent of jurisdiction and preclude a demand for jury trial.

Argument was heard before me on July 18, 1984, at which time the parties were directed to submit memoranda of law on the possible effects on the issues raised in this matter of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (July 10, 1984) (1984 Act).

My recommendation is that the defendant's motion to withdraw the reference from the bankruptcy court be denied and that the demand for a jury trial be stricken.

## A. FINDINGS OF FACT

Defendant HDC is a corporate governmental agency constituting a public benefit corporation of the State of New York. HDC issues bonds and notes so as to provide mortgage financing for low-income residential construction and rehabilitation.

Plaintiff Lombard-Wall Incorporated (Lombard) is a Delaware corporation with its principal place of business in New York City. Lombard is in the business of arbitrating government obligations and other money market instruments.

On August 12, 1982, Lombard filed a petition for reorganization relief under Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1101 *et seq.* (Supp. III 1979). No trustee was appointed and Lombard remained in possession and continued to operate its business during the reorganization period. 11 U.S.C. §§ 1104, 1106–07.

In order for HDC to ensure sufficient funds to satisfy the holders of its debt securities and to maintain its credit and bond rating, HDC invested the proceeds of its financings until the day the funds were needed to issue mortgages. One method HDC used in making these investments was to enter into repurchase or "repo" agreements whereby it purchased debt securities from a seller who, at the time of sale, agreed to repurchase the securities on specified terms and conditions. The time for repurchase was fixed at a specific future date (fixed date) or on demand (flexible).

At the time Lombard filed the petition, HDC and Lombard were engaged in several fixed repurchase agreements (the Repurchase Agreements).

Lombard, HDC and J. Henry Schroder Bank & Trust Company (Schroder), as fiscal agent for HDC, entered into three investment agreements, dated February 3, 1981, March 24, 1981, and April 15, 1982 (the Investment Agreements). Under the terms of each Investment Agreement, (1) HDC deposited in an account with Schroder funds generated by the sale of public construction loan note issues; and (2) Lombard agreed to sell Schroder certain securities (the Securities), and Lombard agreed to repurchase the securities from Schroder in an amount equal to the purchase price, plus all earned and accrued interest on the purchase price at a specified interest rate. The fair market value of the Securities had to be at least 101% of its purchase price. Income produced by the collateral went to Lombard, and that income was greater than the repurchase interest payable to Schroder, as fiscal agent for HDC.

HDC was entitled under the Investment Agreements to require Lombard to repurchase investment obligations in an amount sufficient to enable HDC to fund its construction mortgage loans.

As a condition to entering into each Investment Agreement, Lombard was required to provide to Schroder, as fiscal agent for HDC, an irrevocable letter of credit in a defined amount, to guarantee Lombard's obligations under the investment Agreements (the letters of credit or LCs). Lombard had Chase Manhattan Bank N.A. (Chase) issue a letter of credit for each of the three Investment Agreements, dated January 27, 1981, March 23, 1981 and April 14, 1982, respectively.

Each letter of credit by its terms pertained to a particular Investment Agreement. To effect a draw, HDC through its fiscal agent, had to represent that a certain sum was "due and owing" in accordance with the terms and conditions of the particular Investment Agreement.

On the date of the petition, HDC had invested approximately $130,000,000 with Lombard under Repurchase and Investment Agreements.

At the time Lombard's petition was filed, Lombard was allegedly in default of its obligation to repurchase $600,000 of securities pursuant to the terms of the Investment Agreements, and $5,000,000 of securities as required by the terms of the Repurchase Agreements. Therefore, on August 16, 1982, HDC commenced an adversary proceeding in this court seeking declaratory relief from the statutory stay in effect under 11 U.S.C. § 362(a) and for an order under 11 U.S.C. § 365 compelling Lombard to assume or reject the Investment Agreements to the extent that they were deemed executory contracts. HDC also filed an emergency application for an order under 11 U.S.C. § 363(f) vacating the automatic stay to permit HDC to sell the Securities held by Schroder, its fiscal agent, pursuant to the Investment Agreements so as to enable HDC to meet certain immediate financial obligations.

On August 18, 1982, HDC and Lombard entered into a stipulation of settlement, allowing HDC to sell the Securities it held through its fiscal agent (the Stipulation). The Stipulation was authorized by order of this court dated August 18, 1982, following a hearing. The August 18, 1982 order expressly referred to the matters developed at the hearing. The Stipulation was described as "an interim procedure to minimize any further liability of the Lombard estate of HDC," in which the parties preserved all their legal rights and did not admit or deny the assertions made in the adversary proceeding. Paragraph five further stated that the Stipulation would be without prejudice to the parties' respective rights, contentions and assertions. In paragraph eight, the parties expressly agreed that the bankruptcy court would have jurisdiction to enforce the terms of and to resolve any dispute arising from the Stipulation.

On August 19, 1982, the day after the Stipulation was entered into, HDC caused draws to be made on the March 23, 1981 letter of credit and the April 14, 1982 letter of credit in the amounts of $225,978 and $1,300,798, respectively, representing that the amounts were "due and owing" under the Investment Agreements. Lombard alleges that HDC caused Chase to cancel the January 27, 1981 letter of credit on or about August 19, 1982.

After the sale of the Securities pursuant to the Stipulation, excess funds amounted to $7,389,980 after deducting principal and accrued interest due to HDC at the date of sale. Lombard claims that $7,000,000 was remitted to it two to five days after the sale, $119,522 was remitted on October 29, 1982, and the remaining $270,452 of excess funds was remitted on July 10, 1983, after Lombard obtained an order from this court dated June 30, 1983, directing that HDC deliver to Lombard $270,452 plus interest from August 23, 1982.

On March 15, 1983, HDC filed a proof of claim with the bankruptcy court, stating that Lombard was indebted to HDC in an undetermined and unliquidated amount, arising from Lombard's retention of a portion of the sale proceeds of the securities that HDC purchased from Lombard pursuant to the Investment Agreements.

On July 14, 1983, an order was entered confirming Lombard's plan of reorganization.

On October 14, 1983, Lombard commenced the present action in the bankruptcy court by filing a complaint against HDC (the Complaint) containing sixteen claims for relief.

The first eight claims for relief arise from HDC's draws on the March 23, 1981 and April 15, 1982 letters of credit (LCs) in the total amount of $1,526,776. Lombard alleges that HDC falsely represented the

amounts drawn were "due and owing" under the Investment Agreements; that the draws on the LCs violated § 502(b)(2) of the Code as an unallowable claim for unmatured interest; conversion; and breach of warranty.

The ninth, tenth, and thirteenth claims for relief arise from HDC's alleged withholding of the excess proceeds from the sale of Securities in August 1982 for periods of time ranging from two to five days to over nine months following sale, and claiming interest of approximately $33,000.

The eleventh and twelfth claims for relief are for coupon interest payments on the Jumbo C.D.'s allegedly due to Lombard pursuant to the terms of the Investment Agreements and the Stipulation, in the amount of $151,000. Lombard alleges breach of contract and conversion against HDC in these two claims, respectively.

The fourteenth claim for relief is for interest on Jumbo C.D. coupon payments that were allegedly withheld from Lombard for five months, in the amount of $7,000.

The fifteenth claim for relief alleges HDC withheld coupon payments on U.S. Treasury and Agency Securities for four months, and asks for interest of $6,000.

The sixteenth claim for relief alleges that HDC refused to pay Lombard the full amount of interest due on a Bank of Tokyo certificate of deposit, and asks for damages of $41,291.03 plus interest.

On December 2, 1983, HDC filed an answer in which it generally denied liability to Lombard, asserted the bankruptcy court's lack of subject matter jurisdiction as its first affirmative defense, and demanded trial by jury. HDC interposed a counterclaim for damages of $1,000,000, alleging that Lombard defaulted under the March 24, 1981 Investment Agreement by failing to repurchase approximately $600,000 of securities, and under the Repurchase Agreements by failing to repurchase $5,000,000 of securities, and failed to perform other of its obligations under these agreements.

In its Reply to HDC's counterclaim dated December 16, 1983, Lombard raised, among its seven affirmative defenses, that (1) the counterclaim had been waived by failure to assert it in the proof of claim filed by HDC pursuant to § 501(a) of the Bankruptcy Code (Code); (2) the counterclaim was barred as a set-off prohibited by § 553(a)(1) of the Code; and (3) the counterclaim was barred by the discharge provisions of §§ 1141 and 524(a)(2) and (3) of the Code.

On January 6, 1984, defendant HDC made a motion under Emergency Bankruptcy Rule I(a)(2) [1] to withdraw the reference of this action from the bankruptcy court and have the action tried in the district court before a jury.

### B.  CONTENTIONS OF THE PARTIES

HDC claims that Lombard's action represents essentially a breach of contract and tort dispute raising primarily issues of state law, akin to the factual situation posed by *Marathon*. *Marathon* was a state common law action in contract and tort. The Supreme Court decided in a plurality opinion that bankruptcy courts, as non-Article III courts, could not constitutionally exercise jurisdiction over state claims related only peripherally to bankruptcy. *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Therefore, HDC concludes that since this action involves primarily state common law claims that may be sued upon independently of bankruptcy law, it must be heard by an Article III court.

Lombard has raised the following points in opposition to the motion:

> Since the jurisdictional provisions of the 1984 Act govern this action, the Report and Recommendations address the jurisdictional issues as raised within the applicable provisions of the 1984 Act.

---

**1.** When this order was issued, Emergency Rule I was in effect. However, on July 11, 1984 Emergency Rule I was superseded by the jurisdictional provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (July 10, 1984) (1984 Act).

First, Lombard argues that numerous issues in this action arise from bankruptcy law. Specifically, Lombard claims that (1) this is a turnover proceeding pursuant to § 541 and § 542 of the Bankruptcy Code; (2) that the funds drawn on the letters of credit are future unmatured interest prohibited by § 502(b)(2) of the Code; (3) that Lombard's defenses to HDC's counterclaim raise a number of issues within traditional bankruptcy court jurisdiction (*see* § A, *supra*); and (4) that Lombard seeks to have HDC comply with the bankruptcy court's order of June 30, 1983 directing HDC to pay to Lombard certain excess funds from the sale of Securities plus interest. In its supplemental memorandum of law (dated August 3, 1984), Lombard also contends that this action constitutes a core proceeding as defined in the 1984 Act. 28 U.S.C. § 157(b)(2).

Second, Lombard argues that HDC has consented to bankruptcy court jurisdiction of this action (1) in the Stipulation of August 18, 1982 approving the sale of the Securities; (2) in the provision of Lombard's Plan of Reorganization retaining bankruptcy court jurisdiction; and (3) by filing a proof of claim against the debtor on March 15, 1983.

Since this Report finds that HDC, by its prior actions, consented to bankruptcy court jurisdiction of this action, it is not necessary to determine whether the issues raised by the action arise under bankruptcy law. However, the argument that HDC consented to jurisdiction by filing a proof of claim necessarily leads to the conclusion that this action is a core proceeding under 28 U.S.C. § 157(b)(2)(C), and as such arises under bankruptcy law. *See* § E, *infra*.

## C. THE STIPULATION

One of Lombard's central contentions is that HDC consented to bankruptcy court jurisdiction of this dispute by virtue of paragraph eight of the Stipulation, in which the parties agreed that this court would have jurisdiction "to enforce the terms [of the agreement] and to resolve any dispute arising therefrom."

The relevant substantive terms of the Stipulation are as follows:

1. Lombard hereby agrees to modifications of the automatic stay provisions of 11 U.S.C. § 302(a), to the extent applicable, so as to permit the orderly sale of the Securities by HDC in consultation with, or at the request of Lombard, on the condition that HDC promptly remit to Lombard any monies in excess of that which Lombard had agreed to pay to HDC in return for the securities.

2. HDC will not dispose of the approximately $30,000,000 of certificates of deposit included in the Securities ... prior to the maturity dates set forth on such certificates, and, upon maturity of such certificates, all proceeds thereof shall be the property of HDC.

3. Lombard hereby agrees that it will not seek to enjoin or otherwise interfere with HDC's asserted right to obtain payment under any letters of credit issued for its benefit by Chase Manhattan Bank, N.A.

HDC does not dispute that Lombard's last eight claims for relief arise from the terms of the Stipulation.

At issue are the first eight claims for relief concerning the draws on the letters of credit (the LCs) which constitute approximately $1,500,000 of the over $1,700,000 total damages sought by Lombard in this action. The claims involve HDC's two August 19, 1982 draws on the letters of credit of March 23, 1981 and April 14, 1982, in the amounts of $225,978 and $1,300,798, respectively.

HDC argues that it did not consent to jurisdiction over the LC issue in paragraph eight, because it is not a dispute arising from the terms of the Stipulation. HDC maintains that the Stipulation did not deal with the propriety of HDC's draws on the LCs; that the only mention of the LCs in the Stipulation was the statement in paragraph three that Lombard would not interfere with HDC's right to payment under them. HDC's position is that the propriety of the draws is based on the issue of

whether the funds were "due and owing" under the terms of the Investment Agreements, not under the Stipulation.

Lombard contends that the letter of credit issue is connected to the Stipulation, because Lombard agreed not to interfere with the LCs in paragraph three based on the assumption that HDC would have no right to payment under the letters if HDC were made whole after the Securities sale.

HDC's position that this dispute does not arise from the Stipulation is based on too literal a reading of its terms. The Stipulation must be viewed together with the hearing on the Stipulation of August 18, 1982, as well as other relevant events, documents, and deposition testimony adduced by Lombard.

The August 18, 1982 order of this court approving the Stipulation specifically did so in light of the matters developed at the hearing of the same date.

During the hearing, the following exchange took place:

> THE COURT: There are obvious questions that occur in terms of what would happen if the Chase were called upon to honor the LC, and it would be some kind of a claim to try and get itself made whole again. I gather from what has been described here that you are not intending to call down, *and I address this to HDC, you are not intending to call down on the LC, because I think if it is involved in this proceeding we ought to get it on the record.*
>
> MR. COOK: I can't tell you what HDC will do in the future, and I am really after yesterday, not in a position. I think you initiated these proceedings by stating that it is just to keep the wheels moving, getting the things going without prejudice to anybody's rights.

Transcript of Hearing to Dispose of Collateral at 35–36 (Aug. 18, 1982) (Transcript) (emphasis added).

In light of this answer, the court later stated that matters concerning the LC arrangements should be the subject of a separate application:

> THE COURT: If in fact there is another arrangement here between the debtor, HDC and Chase vis-a-vis the Letter of Credit and ultimate responsibility for that, that also would seem to be a subject for another application on another date when possibly interested parties will have an opportunity to look at all of the facts and circumstances of their relationship and for some judgment as to whether they oppose, don't oppose it or have no interest in it.

Transcript at 40–41.

However, in contrast to Mr. Cook's response to the court on August 18, 1982, two days before, on August 16, 1982, Schroder had written to Chase, stating that it had received instructions from HDC to draw approximately $600,000 on the March 23, 1981 letter of credit. Michael Smith, Executive Director of HDC, testified at his deposition that his working assumption throughout that week of negotiations, both before, during and after his appearance in court, was that a larger draw on the letter of credit would be necessary and would supersede HDC's initial draw in the amount of $600,000. Deposition of Michael Smith at 53–54 (Jan. 13, 1984).

These facts were not brought out at the hearing in response to the court's questioning as to potential draws by HDC. HDC's silence as to its intentions to draw on the LCs does not remove the issue of subsequent draws on the LCs from the parameters of the court-approved Stipulation. If HDC's intentions had been presented at the hearing, the draws would certainly have been covered in the Stipulation and the amounts that could be drawn specified, so that a dispute such as this would clearly have arisen under the Stipulation.

The day after the Stipulation was approved, on August 19, 1982, Schroder, as fiscal agent for HDC, drew $225,978 and $1,300,798 on the March 23, 1981 and April 14, 1982 LCs, respectively, representing to Chase that the amounts were "due and owing" under the Investment Agreements.

■ By HDC's own account, it drew on the LCs because it was not made whole by

the sale of securities provided for in the Stipulation. It is evident that the LC issue at the heart of this litigation, if not literally arising from a term of the Stipulation, is integrally related to its provisions. The status of the LCs, and the possibility that HDC might draw upon them, were mentioned at the hearing (and incorporated in the Order approving the Stipulation). For this reason, the LC issue is "a dispute arising from" the Stipulation, by which the parties consented to bankruptcy court jurisdiction pursuant to paragraph eight.

The conclusion that the LC issue and the provisions of the Stipulation are integrally linked is also suggested by deposition testimony given by HDC's Executive Director, Michael Smith. His deposition directly connects the draw on the March 23, 1981 LC to a dispute over how to interpret a provision in the Stipulation. Mr. Smith recounted that he heard Harold Kurtz, President of Lombard, testify at the August 18, 1982 hearing that Lombard interpreted paragraph two of the Stipulation to mean that HDC would not be entitled to all of the interest from the proceeds of the Jumbo C.D.s held by HDC, but only to interest equal to the rate on the Investment Agreements. Mr. Smith testified that this was at odds with HDC's understanding:

> [W]e thought we had been assured by Mr. Kurtz initially, that we could hold the C.D.s and keep the interest, even though the interest was higher than their investment agreement obligation ... we represented to Chase that because we did not wish to reap a windfall we were prepared to allow them [Chase], in effect ... to get the benefits of that excess interest.
>
> .    .    .    .    .
>
> The matter became confused later on when we realized that the question of whether we could keep the excess interest was under a cloud because of Mr. Kurtz's testimony. And that's when we instituted what I previously described as the $225,000 insurance policy.

Deposition of Michael Smith at 256–66 (Feb. 7, 1984).

According to this deposition, therefore, HDC drew on the March 23, 1981 LC in the amount of $225,978 as an "insurance policy" in case its entitlement to all of the interest from the proceeds of the Jumbo C.D.s was disputed by Lombard. Pursuant to a letter agreement between HDC and Chase dated August 19, 1982, HDC deposited the $225,978 draw in an interest-bearing account at Chase; it agreed to allow Chase to keep the deposit plus interest if HDC was permitted by the bankruptcy court to retain the money. This agreement is apparently what is referred to in the first paragraph quoted.

The significance of this is that, at least by the account of the Executive Director of HDC, one of the draws resulted from a dispute over the interpretation of a provision of the Stipulation, i.e., how much interest HDC was entitled to under paragraph two. Therefore, the parties consented to bankruptcy court jurisdiction of that dispute pursuant to paragraph eight of the Stipulation.

## D. THE PLAN OF REORGANIZATION

Lombard contends that the retention of jurisdiction provision of Article V of its plan of reorganization, to which HDC did not object, constitutes consent to bankruptcy court jurisdiction by HDC. Section 5.01 of the Plan provided that, after the confirmation date, the bankruptcy court would retain "such jurisdiction over the affairs of Lombard ... as is legally permissible", including jurisdiction "over any disputes which may arise in connection with settlement agreements entered into by [Lombard] after the petition date."

Lombard's plan was confirmed within a year of the filing of the Chapter 11 petition. The plan provided for allowed claims, which were to be paid in full immediately after the plan's effective date, and disputed claims, which would be paid from a Disputed Claims Account when and if such claims were allowed by order of the bankruptcy court or by stipulation of the parties. In Article I, § 1.14 of the plan, HDC was

listed as a creditor holding a disputed claim.

Judge Goettel notes in his order referring this motion to the bankruptcy court that the Lombard reorganization was a most unusual one. Before confirmation, Lombard had entered into settlement agreements with many of its creditors holding disputed claims, such as HDC, allowing them to liquidate securities they held and deferring their disputed claims until after confirmation. As already noted, bankruptcy court jurisdiction was specifically retained over disputes that might arise under the settlement agreements.

Section 1142 of the Code provides in pertinent part that "the court may direct the debtor and any other necessary party ... to perform any ... act ... that is necessary for the consummation of the plan."

■ It is well-settled that confirmation of a plan is but a step in the administration of the debtor's estate; the bankruptcy court is still responsible for overseeing execution of the plan. *Meyer v. Kenmore Granville Hotel,* 297 U.S. 160, 165–66, 56 S.Ct. 405, 407–08, 80 L.Ed. 557 (1936). Under the Act, prior to entry of the final decree in Chapter X, the bankruptcy court retained jurisdiction to prevent interference with execution of the plan and to aid in its operation. *In re New York, N.H. & H.R. Co.,* 169 F.2d 337, 340 (2d Cir.1948); *In re Pittsburgh Terminal Coal Corp.,* 183 F.2d 520, 522, *cert. denied,* 340 U.S. 904, 71 S.Ct. 280, 95 L.Ed. 654 (3d Cir.1950).

Although Lombard's reorganization plan has been confirmed and the allowed claims paid in full, the case is clearly not closed, because the plan is not consummated; HDC's disputed claim has yet to be adjudicated. Therefore, the bankruptcy court retains jurisdiction to aid the effectuation of the plan.

■ Since HDC's claim is explicitly listed in the plan as disputed, and HDC did not object to the plan, it cannot be inequitable for HDC to be bound by its implied consent to the Plan's retention of jurisdiction provision. This provision governs Lombard's claims for relief with respect to the LC draws as a "dispute arising in connection with settlement agreements ...." pursuant to the language of Art. V, § 5.01 of the plan.

The unusual speed with which this plan was proposed and confirmed was due to Lombard's settlement of its disputed claims, which allowed the creditors to liquidate their securities, thereby holding any disputes in abeyance until after confirmation. The plan states that these settlements placed Lombard in a position to propose and confirm the plan of reorganization, providing for prompt payment of allowed claims in full, with interest.

### E. THE PROOF OF CLAIM

In addition, consent to bankruptcy court jurisdiction over the first eight claims for relief involving the LCs may be implied by HDC's filing of a proof of claim on March 15, 1983. The proof of claim states that Lombard is indebted to HDC in an undetermined amount, due to Lombard's "retention of a portion of the sales proceeds of certain securities that HDC purchased from the debtor pursuant to three investment agreements." The proof of claim makes specific reference to the Stipulation ("Under an interim settlement agreement between the debtor and HDC, HDC agreed to remit certain of the sale proceeds to the debtor, without prejudice to its rights to assert ownership of the proceeds."), and it further states that the claim is contingent, in part, upon the bankruptcy court's ruling "that the [Investment] Agreements are in any manner still in force and effect and the HDC has any continuing obligation under the Agreements."

HDC has consistently described its draws on the LCs as an attempt to recover what it was due under the Investment Agreements and which it did not recoup from the sale of the securities. Therefore, both the proof of claim and the LC issue require the court to construe the Investment Agreements. Moreover, the proof of claim specifically states that Lombard owes HDC a portion of the proceeds from the

August 18, 1982 sale of securities pursuant to the Stipulation.

■ The filing of a proof of claim constitutes consent to bankruptcy court jurisdiction over the debtor-in-possession's objections or counterclaims that are necessary for adjudication of the claim. *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966); *Nortex Trading Corp. v. Newfield*, 311 F.2d 163 (2d Cir.1962); *see also Depo v. Lincoln First Bank (In re Depo)*, 40 B.R. 537 (N.D.N.Y.1984) (holding that filing a proof of claim implies consent to bankruptcy court jurisdiction over claims asserted by the debtor which are logically connected to the claim). Lombard's claims with respect to the LCs may be viewed as in the nature of a counterclaim to HDC's proof of claim, because they both arise from the same transaction. The LC issue is so logically connected to the proof of claim that judicial economy and fairness dictate they be decided in the same forum. Therefore, HDC's filing of the proof of claim constitutes implied consent to the jurisdiction of the bankruptcy court over the LC issue raised in the first eight claims for relief of the Complaint. *See also* Bankruptcy R. 7013.

Further, the bankruptcy court has jurisdiction over this action because it constitutes a core proceeding arising under title 11, as a counterclaim by the estate against a creditor which has filed a claim. 28 U.S.C. § 157(b)(2)(C). Lombard's claims for relief with respect to the LC draws may be viewed as conceptually a compulsory counterclaim to HDC's proof of claim, involving the same subject matter as the proof of claim, requiring construction of the same agreements, and arising from the same transactions, the August 1982 sale of securities.

## F. DEMAND FOR JURY TRIAL

HDC had demanded jury trial in this action before an Article III judge. Lombard argues that HDC's consent to the jurisdiction of the bankruptcy court precludes trial by jury. For the reasons stated herein, the defendant's motion for jury trial ought be denied.

■ The issue is whether there is a constitutional right to jury trial in an action in which the claims are primarily at law, as here, but where a continued course of implied consent to the summary jurisdiction of the bankruptcy court has been evinced.

Under the Bankruptcy Code, the right of a party to jury trial is governed by 28 U.S.C. § 1480(a):

§ 1480 Jury trials:

(a) Except as provided in subsection (b) of this section, this chapter and title 11 do not affect any right to trial by jury, in a case under title 11 or in a proceeding arising under title 11 or arising in or related to a case under title 11, that is provided by any statute in effect on September 30, 1979.

Since § 1480(a) of the Code preserves the right to jury trial as it existed under the Act, one must first determine if the action would be a summary proceeding with no right to jury trial, or a plenary action under the Act.

Section 2a(7) of the Act permitted the bankruptcy court to exercise summary jurisdiction by consent. There would be no right to jury trial if the adverse claimant expressly or impliedly consented to the court's summary jurisdiction, such as by filing a proof of claim.

"[W]hen the same issue [as presented in a creditor's claim] arises as part of the process of allowance and disallowance of claims, it is triable in equity" under the summary jurisdiction of the bankruptcy court, with no Seventh Amendment right to trial by jury. *Katchen v. Landy*, 382 U.S. at 336, 337, 86 S.Ct. at 476, 477. The same result follows here. Thus HDC has no constitutional right to jury trial in an Article III court, and its demand should be denied.

## G. CONSTITUTIONALITY OF BANKRUPTCY JUDGES' APPOINTMENT UNDER 1984 ACT

Finally, HDC has raised the issue that the bankruptcy judges' jurisdictional man-

date may be thrown into doubt because Congress's extension of their terms pursuant to the recently enacted Bankruptcy Amendments and Federal Judgeship Act of 1984 (1984 Act) violates the Appointments Clause of the Constitution.[2]

■ HDC urges that, in view of the constitutional uncertainty surrounding the bankruptcy judges' jurisdiction, HDC's motion to withdraw the reference from the bankruptcy court should be granted.[3] However, it is well settled that there is a presumption in favor of the constitutionality of an Act of Congress. *See, e.g., Regan v. Time, Inc.,* —— U.S. ——, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984); *Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981). Mere uncertainty as to the constitutionality of a statute does not rebut that presumption.

Moreover, HDC does not raise a direct constitutional challenge to the bankruptcy judges' jurisdiction under the 1984 Act. It is therefore unnecessary to make a determination on this issue at the present time.

### H. SUMMARY AND RECOMMENDATIONS

HDC contends that this is a garden-variety state claim action governed by the plurality opinion in *Marathon.* But *Marathon* did not involve consent to jurisdiction by the defendant, as this case does. The bankruptcy court may properly exercise jurisdiction over an adversary proceeding based on defendant's implied consent. *See, Cline v. Kaplan,* 323 U.S. 97, 99, 65 S.Ct. 155, 156, 89 L.Ed. 97 (1944); *Gluck v. Seaboard Surety Co. (In re Eastern Freight Ways),* 577 F.2d 175, 183 (2d Cir.1978). Since consent is the predicate for jurisdiction in this action, the state law claims

raised by Lombard may be heard by a non-Article III court, that is, by the bankruptcy court.

I therefore recommend the bankruptcy court retain jurisdiction for non-jury trial of all of HDC's claims for relief because of HDC's consent to jurisdiction.

1. The central dispute of the complaint, that of the draws of the letters of credit (the first eight claims for relief), is integrally related to the provisions of the Stipulation. HDC consented to bankruptcy court jurisdiction pursuant to paragraph eight. HDC does not dispute that the last eight claims for relief arise under the terms of the Stipulation.

2. Under Lombard's plan of reorganization, the bankruptcy court retained jurisdiction over disputes arising from post-petition settlement agreements. HDC impliedly consented to bankruptcy court jurisdiction over Lombard's claims involving the LC draws, because they constitute a dispute arising from such a settlement agreement.

3. HDC's filing of a proof of claim constituted consent to Lombard's claims regarding the LC draws because the draws involve essentially the same subject matter as the proof of claim, and both arise from the Investment Agreements and the sale of Securities pursuant to the Stipulation.

4. The bankruptcy court has jurisdiction of the compulsory counterclaim interposed by HDC based on the bankruptcy court's jurisdiction over the Complaint. This is because by definition, the compulsory counterclaim arises out of the same transaction as stated in the Complaint.

---

**2.** Section 121(e) and 106(a) of the 1984 Act extended the terms of office of the bankruptcy judges from June 27, 1984 when they had expired by operation of law, through July 10, 1984, the date of enactment, and for a period of four more years since each judge's last date of appointment. Thus, Congress in effect acted to reappoint the bankruptcy judges whose terms had expired. This arguably violates the Appointments Clause of the U.S. Constitution, which provides that officers of the United States

are to be nominated and appointment by the President, with the advice and consent of the Senate. U.S. Const. art II, § 2, cl. 2.

**3.** A recent district court decision in California addressing this issue has upheld the constitutionality of the bankruptcy judges' authority under the 1984 Act. *In re George I. Benny,* 44 B.R. 581 (N.D.Cal.1984).

In essence, the components of this action must be viewed as a counterclaim by the estate against a creditor which has filed a claim and is therefore a core proceeding under 28 U.S.C. § 157(b)(2)(C).