In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.

The LTV CORPORATION, LTV Steel Company, Inc., BCNR Mining Corporation and Nemacolin Mines Corporation, Plaintiffs,

v.

The AETNA CASUALTY AND SURETY COMPANY, National Fire Insurance Company of Hartford and the Commonwealth of Pennsylvania, Defendants.

Bankruptcy Nos. 86 B 11270 (BRL) through 86 B 11334 (BRL), 86 B 11402 (BRL) and 86 B 11464 (BRL). Adv. No. 88–5971A.

United States Bankruptcy Court, S.D. New York.

July 11, 1990.

Davis Polk & Wardwell by Karen E. Wagner, Regina Shannahan, New York City, for debtors.

Stroock & Stroock & Lavan by Mark Speiser, New York City, for Steel Creditors Committee.

LeRoy S. Zimmerman, Atty. Gen., Com. of Pa. by Calvin R. Koons, Harrisburg, Pa.

Hebb & Gitlin by Harold Horwich, Hartford, Conn., Thomas & Thomas by James K. Thomas, II, Harrisburg, Pa., Moses & Singer by Thomas R. Slome, Michael Luskin, New York City, Luskin & Stern, New York City, for Aetna Cas. & Sur. Co.

Zalkin, Rodin & Goodman by Richard S. Toder, New York City, for Nat. Fire Ins. Co. of America.

MEMORANDUM DECISION ON MOTIONS TO DISMISS AND CROSS–MOTIONS FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Bankruptcy Judge.

The central dispute which must be determined by this Court is whether certain surety bonds issued pursuant to the worker's compensation self-insurance program of the Commonwealth of Pennsylvania, were in effect when the principals filed for bankruptcy protection.

## BACKGROUND

On July 17, 1986 and thereafter LTV Steel Company, Inc. ("LTV Steel") and sixty-six affiliated companies, including BCNR Mining Corp. ("BCNR") and Nemacolin Mines Corp. ("Nemacolin"), filed petitions for reorganization under Chapter 11 of the Bankruptcy Code (the "Code") and were continued in the management and possession of their businesses and properties as debtors-in-possession (collectively, the "Debtors").

Prior to the filing, LTV Steel was self-insured in twelve states.[1] As of the Chapter 11 filings, LTV Steel had open workers' compensation liabilities of approximately $146 million. Upon the filing, LTV Steel was obligated to cease payment of all pre-petition obligations including pre-petition workers' compensation obligations. Most of LTV Steel's pre-petition workers' compensation obligations were shared by either surety companies or state-sponsored funds, which assumed and began paying such claims upon the default of LTV Steel. As a result of such payments the state funds and surety companies, including The Aetna Casualty and Surety Company ("Aetna") and National Fire Insurance Company of Hartford ("National"), have filed over 194 proofs of claim in these bankruptcy proceedings in excess of $450 million. Aetna and National alone have filed approximately forty-two proofs of claim for over $58 million with respect to the surety bonds which are in dispute in this action.

Prior to the filing date, LTV Steel, its predecessors, and its subsidiaries Nemacolin and BCNR, applied and qualified for status as self-insured employers under the Pennsylvania Workmen's Compensation Act, Pa.Stat.Ann. tit. 77 § 501 (Supp.1988) (the "Workmen's Compensation Act"). Pursuant to that statute and the regulations promulgated thereunder, the Commonwealth of Pennsylvania, Department of Labor and Industry, Bureau of Workers' Compensation (the "Bureau") reviews each employer's annual application for self-insured status. The Bureau conditions its approval on the requirement that the employer post a surety bond which will provide coverage in the event that the employer defaults on its workers' compensation obligations. 34 Pa.Code 121.19. Between 1978 and 1986 such bonds were supplied by Aetna and National.

Beginning in August 1986 and continuing thereafter, the Bureau made periodic demands upon Aetna, National and another surety, American Casualty Company of Reading Pennsylvania ("American Casualty") as sureties for the workers' compensation obligations of these Debtors in accordance with the applicable terms of the surety bonds[2]. In August 1988, due to the periodic demands made by the Bureau, the full value of the American Casualty surety bond No. 573 59 44 with a penal sum of $2 million, had been drawn down. The Bu-

---

**1.** Alabama, Ohio, Pennsylvania, Michigan, Minnesota, Illinois, Indiana, West Virginia, Kentucky, New Jersey, New York and Connecticut.

**2.** For example, ¶ 1 of the Aetna surety bonds, reads as follows:

1. In the event of default or failure of the Principal to pay compensation including, without limitation, payments for burial expenses, hospital services, hospital supplies, physician's fees and all other payment provided for under The Pennsylvania Workmen's Compensation Act and The Pennsylvania Occupational Disease Act, including, but not limited to, awards for disability or death arising out of and in the course of employment which occurred prior to the effective date of this bond, as required under said acts as amended, or as may be amended, or the rules and regulations issued thereunder or the agreement and undertaking executed by the Principal as

a self-insurer, or in the event of insolvency, bankruptcy or receivership of the Principal, the Director of the Bureau of Workers' Compensation may from time to time make written demand personally or by mail upon the Principal and Surety to pay to said Director such sum or sums as the Director may require to discharge promptly all or any part of the obligations of the Principal, past, present, future or potential, under or pursuant to said acts, or rules and regulations, issued thereunder or the agreement and undertaking as a self-insurer. Such payment shall be made within fifteen (15) business days after receipt of such demand by the Surety. The Surety shall not be liable for any obligations of the Principal otherwise payable under an approved Workmen's Compensation insurance policy or prior duly accepted Surety bond filed as self-insurer.

reau therefore made additional demands upon Aetna and National with respect to workers whose injuries occurred during or prior to the effective date of the American Casualty surety bond. In November 1988, the Debtors were informed by the Bureau that National and Aetna were refusing to make payments for workers injured prior to October 1983 because they were disputing the extent of their obligations as sureties for certain workers' compensation bonds issued to LTV Steel. The Bureau further informed the Debtors that due to the refusal of Aetna and National to fulfill their obligations, it would be forced to cease making payments to these workers.

In order to prevent hardship to the workers, on December 12, 1988, LTV Steel made an application for and received authority from this Court to make certain interim payments for the benefit of the injured workers. At the time of the application, based upon estimates presented to LTV Steel by the Bureau, LTV Steel expected those payments to be no more than $500,-000 per quarter. However, at the hearing on the matter, the Debtors informed this Court that the Bureau had informed LTV Steel that the original estimates were incorrect. Rather than 70, there were approximately 242 injured workers whose compensation payments were not being paid by Aetna and National and the quarterly cost would be closer to $600,000 rather than the originally estimated $500,000. At that time, the Debtors asserted that they were concerned that future demands for interim hardship payments would become even greater and more burdensome as Aetna and National continued to deny liability for the full extent of their obligations as sureties. On December 27, 1988, pursuant to this Court's order, LTV Steel paid $200,000 over to the Bureau for the benefit of the affected workers.

Subsequently, in May 1990, the Debtors again applied to this Court for permission to make additional hardship payments. In its application, the Debtors stated that in March 1990 the Bureau informed LTV Steel that Aetna had announced its intention to cease making payments when the one surety bond, under which Aetna believed that it was solely liable, was exhausted. It was also represented to the Court that Aetna's bond would be exhausted sometime in June and that the Bureau does not have an established fund from which to pay benefits due to injured workers whose payments were covered by the disputed Aetna surety bonds. Moreover, the Debtors also stated that because of these circumstances, it now estimated that approximately 500 individuals will cease being paid workers' compensation benefits and will suffer hardship as a result. The Debtors estimated that the annual cost of providing such benefits would be $7 million. Consequently, LTV Steel sought authorization to pay interim hardship workers' compensation benefits for claims which are the focus of the instant controversy. On May 30, 1990, this Court approved the Debtors' request.

The dispute between Aetna and the Bureau essentially centers around the extent of Aetna's obligations under five surety bonds. Aetna alleges that from December 15, 1978 and thereafter, Aetna issued surety bonds on behalf of certain LTV Corporations and their predecessors. In connection with the merger of those corporations and their combination with other corporations, Aetna maintains that certain of those bonds were discharged by operation of law or by agreement. Consequently, Aetna contends that at the time of the filing, Aetna had outstanding only one surety bond on behalf of certain LTV Corporations in the penal sum of $27.0 million. In contrast, both the Debtors and the Bureau contend that Aetna is liable under all five bonds with an aggregate bond penalty of $51.0 million.

The bonds that the Debtors and the Bureau contend are collectible are as follows:

*Bond No. 018 S 69174:* issued on behalf of Emerald Mines and Nemacolin Mines. Emerald Mines was deleted by rider and the penal sum was reduced effective 7/1/80. The penal sum of this bond is $2.5 million. Aetna asserts that this bond was replaced by bond No. 018 S 71955.

*Bond No. 018 S 69175:* issued on behalf of General Alloy Casting Company. The penal sum of this bond is $.5 million. Aetna asserts that this bond was replaced by bond No. 018 S 71955.

*Bond No. 018 S 68212:* issued on behalf of Jones & Laughlin. The penal sum of this bond is $14 million. Aetna asserts that this bond was replaced by bond No. 018 S 71955.

*Bond No. 018 S 100071193:* issued on behalf of Republic Steel and BCNR. The penal sum of this bond is $7 million. Aetna asserts that this bond was replaced by bond No. 018 S 71955.

*Bond No. 018 S 71955:* initially issued on behalf of Jones & Laughlin in the penal sum of $12 million. Aetna asserts that this bond was initially issued as the replacement for the three pre-existing bonds (Nos. 018 S 69174, 018 S 69175 and 018 68212) and subsequently replaced bond No. 018 S 100071193 upon the merger of Jones & Laughlin and Republic Steel, with an increase in the penal sum to $27 million.

## Procedural History of the Case

On December 1, 1988, the Debtors filed an action in this Court seeking a declaratory judgment that Aetna and National[3] are liable to the full extent of their obligations as sureties as expressed by the terms of the bonds (the "Adversary Proceeding"). LTV Steel seeks judgment, *inter alia*, declaring that certain surety bonds issued by Aetna remain in force and effect and that Aetna's liability to the Bureau pursuant to those bonds is coextensive with the face value, as modified by rider, of each bond; and declaring that Aetna must reimburse the Debtors for any interim payments made for workers' compensation benefits, as authorized by this Court, that are found to be the obligations of Aetna. The Bureau is a party to this lawsuit.

On December 19, 1988 LTV Steel moved for partial summary judgment for a declaration as a matter of law that all five worker's compensation surety bonds issued by Aetna remain in force and effect. Aetna then moved to dismiss LTV Steel's complaint, alleging, *inter alia*, lack of jurisdiction or, alternatively, that this action is subject to mandatory abstention.[4] Subsequently, Aetna filed its own cross-motion for summary judgment.

On March 3, 1989, the Bureau requested leave to amend its answer in this Adversary Proceeding, and on April 10, 1989, the Bureau was granted leave to file its cross-claims (the "Cross–Claims"). The Bureau seeks in its Cross–Claims an order, *inter alia*, compelling Aetna to comply with its full obligations as surety for the liabilities of the principal; and compelling Aetna to comply with its full obligations for the liabilities of the principal with respect to which National has refused to make payment. The Bureau has joined in the Debtors' motion for partial summary judgment.[5] Aetna has also moved to dismiss or stay the Bureau's Cross–Motions.

The matters presently before this Court are also the subject of two other separate legal actions. Prior to the commencement of this declaratory judgment action, lawsuits between the Commonwealth of Penn-

---

3. The Debtors' action against National involves a controversy as to whether National is liable to the Bureau for any unsatisfied claims made against a surety bond issued by American Casualty for the period from October 23, 1979 through October 23, 1983, which bond has been exhausted by claims in excess of the bond's penal sum. National disputes its liability for injuries which occurred prior to the date of issuance of its bond. As a result of settlement negotiations among the parties, LTV Steel has agreed to adjourn without a date its motion for partial summary judgment against National. Accordingly, the discussion herein does not address that motion.

4. Similarly, National also moved to dismiss the Debtors' complaint on those causes of actions relating to its dispute as to the extent of its liability to the Bureau. To the extent that National raises in co-extensive fashion the same issues relating to jurisdiction and abstention as are raised by Aetna, this Court has considered National's submissions and briefs in connection with its determination of these discrete issues.

5. Additionally, the Official Committee of Unsecured Creditors of LTV Steel (the "Steel Committee") supports the Debtors' motion for partial summary judgment and opposes Aetna's cross-motion for summary judgment.

sylvania and the sureties were commenced in other courts. On September 2, 1988, Aetna filed an action in the United States District Court for the Middle District of Pennsylvania against the Bureau seeking a declaratory judgment that certain surety bonds issued by Aetna are null and void (the "District Court Action"). *Aetna Casualty and Surety Co. v. Commonwealth of Pennsylvania,* slip op. 88–1387 (M.D.Pa. May 8, 1989). LTV Steel was not a party to the lawsuit. The District Court Action was dismissed based upon the District Court's finding that the Bureau is the "alter ego" of the Commonwealth of Pennsylvania and as such it cannot be considered a citizen for diversity purposes. *Id.* at 18. Subsequently, the Third Circuit denied Aetna's appeal. Although the District Court Action has been dismissed based on the Bureau's rights pursuant to the Eleventh Amendment, it is clear that the Bureau has submitted to Federal jurisdiction in this Court. (*See,* Transcript of April 10, 1989 Hearing at 21–23).

On December 8, 1988 the Bureau filed an action in the Commonwealth Court of Pennsylvania (the "Commonwealth Court") seeking a declaratory judgment similar in nature to the motion before this Court. That case was removed upon petition by Aetna to the United States District Court for the Middle District of Pennsylvania. Upon petition of the Bureau, that case has been remanded to the Commonwealth Court. LTV Steel is not a party to the lawsuit. The Bureau has agreed to adjourn its own action in the Commonwealth Court upon this Court's determination to take jurisdiction of the dispute.

### RELIEF REQUESTED

After sifting through the plethora of documents which have been placed before this Court, the basic issue which must be determined is the amount of Aetna's liability for surety bonds issued on behalf of LTV Steel and its predecessor corporations pursuant to the workers' compensation self-insurance program of the Commonwealth of Pennsylvania. Specifically, the dispute involves which surety bonds remained in effect when LTV Steel and its subsidiaries filed for bankruptcy protection in July 1986 and defaulted on their Pennsylvania workers' compensation obligations. Aetna maintains that its surety bond No. 018 S 71955 in the penal sum of $27 million is the only surety bond collectible. In sharp contrast, both the Debtors and the Bureau assert that all five surety bonds issued by Aetna in the total penal sum of $51 million are collectible.

Before reaching a decision on the merits of the cross-motions for summary judgment, this Court must first address several threshold issues which were raised in Aetna's motion to dismiss the Debtors' complaint and the Bureau's Cross–Claims. Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules") made applicable herein pursuant to Bankruptcy Rule 7012 and pursuant to Bankruptcy Rule 5011, Aetna has moved for the dismissal or stay of the within Adversary Proceeding because (1) the Debtors do not state a claim upon which relief can be granted; (2) the Debtors do not have standing to bring an action for declaratory relief in this instance; (3) this Court lacks subject matter jurisdiction over this matter or should abstain from taking jurisdiction; and (4) only the first filed action should proceed. Aetna has also moved for the dismissal or stay of the Bureau's Cross–Claims on similar grounds.

### ISSUES

1) Whether this Court has subject matter jurisdiction of this Adversary Proceeding.

2) Whether LTV Steel has standing to commence this Adversary Proceeding.

3) Whether summary judgment is appropriate in this instance on behalf of either Aetna or the Debtors.

4) Whether parol evidence is admissible to show the intent of the parties involved in these transactions.

5) Whether the affidavits submitted should be stricken for failure to comply with the requirements of Federal Rule 56(e) and Bankruptcy Rule 7056.

6) Whether a novation or substitution of contract occurred.

7) Whether LTV Steel and the Bureau should be estopped from asserting Aetna's liability beyond the penal sum of $27 million.

## DISCUSSION

1) *Whether this Court has subject matter jurisdiction of this Adversary Proceeding.*

■ Aetna asserts that this Court has no subject matter jurisdiction over the Debtors' first cause of action in their complaint and the Bureau's Cross–Claims. Aetna argues that because the matters herein deal with a dispute between Aetna and the Bureau concerning the rights of the Bureau under certain surety bonds issued by Aetna in connection with the Debtors' self-insured workers' compensation program, this action does not arise in, or relate to the Debtors' cases under Chapter 11, nor does it involve property of their estates.

With the passage of a new Bankruptcy Code in 1978 (the "Code"), Congress vested the United States district courts with original and exclusive jurisdiction of all cases commenced under title 11. 28 U.S.C. § 1471(a) (repealed, 1984). The district courts also had original but not exclusive jurisdiction over all civil proceedings arising under title 11 or arising in or related to cases pending under title 11. 28 U.S.C. § 1471(b) (repealed, 1984). Section 1471(c) (repealed, 1984) conferred upon the bankruptcy courts within the district where the title 11 case was pending all of the jurisdic-

tion granted to the district court under 28 U.S.C. § 1471(a).

The scope of the jurisdiction accorded the bankruptcy courts under the newly enacted Code met with constitutional challenges in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.* ("*Marathon*"), 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In *Marathon*, the Supreme Court held that the jurisdiction conferred upon the bankruptcy courts by Congress under 28 U.S.C. § 1471(c) was too broad and, therefore, unconstitutional. *Id.* at 87, 102 S.Ct. at 2880. In response to the Supreme Court's ruling, Congress enacted the 1984 Amendments to the Code (the "1984 Amendments"), which pursuant to 28 U.S.C. § 1334, now vested the district courts with original jurisdiction of all bankruptcy-related cases and proceedings. The district courts are, in turn, authorized under 28 U.S.C. § 157(a) to refer to bankruptcy judges "any or all cases under title 11 or arising in or related to a case under title 11...." Accordingly, pursuant to 28 U.S.C. § 1334(d), the "district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located of the debtor ... and of property of the estate." The District Court for the Southern District of New York (the "District Court") has referred its jurisdiction to this Court by the "Standing Order of Referral of Cases to Bankruptcy Judges" dated July 10, 1984 (Ward, Acting C.J.).

Under the 1984 Amendments, all proceedings in the bankruptcy case are categorized as either "core" or "non-core".[6] The employment of this terminology by Con-

---

6. Section 157(b)(3) provides that "[t]he bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." 28 U.S.C. § 157(b)(3). This determination "is binding, subject only to conventional appellate review." *In re Lion Capital Group*, 48 B.R. 329, 338 (S.D.N.Y.1985).

Pursuant to 157(b)(1), bankruptcy judges are granted the authority to hear and determine all

"core" proceedings and to enter dispositive orders and judgments in connection therewith, subject to appellate review by a district court under 28 U.S.C. § 158(a). In contrast, in "non-core" proceedings the bankruptcy judge is authorized only to conduct a hearing on such proceedings and to submit proposed findings of fact and conclusions of law to the district court for final disposition which are subject to *de novo* review by the district court, unless the parties consent to a final determination thereof by the bankruptcy judge. *See, In re Outlet Dept. Stores, Inc.,* 82 B.R. 694, 695 (Bankr.S.D.N.Y. 1988).

gress is in recognition of *Marathon's* holding that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights...." *Marathon*, 458 U.S. at 71, 102 S.Ct. at 2871; *see also, In re Baldwin–United Corp.*, 48 B.R. 49, 53 (Bankr.S.D.Ohio 1985).

This Court's jurisdiction is further defined by § 157(b)(2)(A) and (O), which state in pertinent part as follows:

> Core proceedings include, but are not limited to—
>
> (A) matters concerning the administration of the estate;
>
> \* \* \* \* \* \*
>
> (O) other proceedings affecting the liquidation of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

■ Under normal circumstances, a suit involving a beneficiary's action to recover on a bond issued by the debtor's surety constitutes a civil proceeding "related to" the bankruptcy case, so that a bankruptcy court has jurisdiction over the proceeding, as the case may affect the plaintiff's status as a creditor of the debtor's estate by reducing or even eliminating its claim. *See, Howard Brown Co. v. Reliance Ins. Co.*, 66 B.R. 480, 481–82 (E.D.Pa.1986). The unique circumstances in this case, however, justifies this Court's determination that this matter is a "core proceeding" rather than merely a proceeding which is "related to" the bankruptcy case. In this instance, this declaratory judgment action was brought by the Debtors themselves, and is not just an adjudication of an action between two creditors. Even more compelling is the effect this matter has on the administration of the estate. LTV Steel's workers' compensation obligations are matters of major importance and their resolution is of central concern to the administra-

tion of these estates. Based on the doctrine of necessity [7], this Court has previously approved the Debtors' request to provide interim hardship payment to injured workers pending a resolution of this dispute. It is estimated that the Debtors will have to pay approximately $7 million a year in order to fill the gap. The Debtors and their creditors are entitled to know as expeditiously as possible whether such payments will need to be made on a more permanent basis. In fact, the Steel Committee has already expressed its concerns as to the duration and amount of these payments [8]. Accordingly, it is clear that the administration of these estates is substantially impacted by the outcome of this Adversary Proceeding.

■ With respect to the administration of the estate, the purpose of the protection provided by Chapter 11 is to give the debtor a breathing spell, an opportunity to rehabilitate its business and to enable the debtor to generate revenue. *See, In re Johns–Manville Corp.*, 801 F.2d 60, 64 (2d Cir.1986); *In re Talladega Steaks, Inc.*, 50 B.R. 42, 44 (Bankr.N.D.Ala.1985). If the surety bonds at issue are available to provide for compensation to injured workers' claims on an interim basis during the period of reorganization, LTV Steel will be relieved of a drain on its cash flow resulting from the hardship payments it has been authorized to pay to the Bureau.

This Court has previously determined that a debtor has a right to preserve the reorganization process as a whole. *In re Johns–Manville Corp.*, 52 B.R. 879, 890 (Bankr.S.D.N.Y.1985). Other courts also have recognized that the bankruptcy court has jurisdiction to hear all matters to expeditiously and effectively administer the estate. *See, e.g., In re Wood*, 825 F.2d 90, 92 (5th Cir.1987); *In re Lion Capital Group*, 46 B.R. 850, 856 (Bankr.S.D.N.Y.1985).

The fact that this declaratory judgment action requires a determination of the

---

7. For a thorough discussion of the doctrine of necessity, *see, In re Ionosphere Clubs Inc.* 98 B.R. 174 (Bankr.S.D.N.Y.1989); *see also,* Eisenberg & Grecker, *The Doctrine of Necessity and its Parameters,* 73:1 Marq.L.Rev. 1–39 (1989).

8. *See,* Transcript of the May 30, 1990 hearing.

meaning of certain bond language pursuant to relevant Pennsylvania law does not render this Adversary Proceeding a non-core proceeding. Section 157(b)(3) states that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by state law." Indeed, as noted by Justice White in *Marathon*, 458 U.S. at 96–97, 102 S.Ct. at 2884–2885, bankruptcy courts are constantly enmeshed in state law issues and any distinction between claims based on state law/federal law is meaningless when the vast majority of claims presented in bankruptcy proceedings are based on state law created rights. Accordingly, issues of comity and state created rights must give way to the aim of Congress to confer the broadest jurisdiction on bankruptcy courts as is constitutionally permissible. *See, NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). "The involvement of state created rights in a bankruptcy matter does not, *ipso facto*, result in a finding that [the state law matter] should not be adjudicated by [the] Court." *In re DeLorean Motor Co.*, 49 B.R. 900, 909 (Bankr.E.D.Mich.1985) (quoting *In re Tom Carter Enterprises, Inc.*, 44 B.R. 605 (C.D. Cal.1984)).

[B]ankruptcy courts are not precluded from hearing state law claims when the claims bear heavily on the administration of the estate. [*See In re Ben Cooper Inc., (Ben Cooper, Inc. v. The Insurance Company of the State of Pennsylvania)*, 896 F.2d 1394, 1399 (2d Cir.1990), *cert. granted sub nom., Ins. Co. of Pennsylvania v. Ben Cooper, Inc.*, —— U.S. ——, 110 S.Ct. 3269, 111 L.Ed.2d 779 (1990)]; *In re Manville Forest Products Corp., Gulf States Exploration Co. v. Manville Forest Products Corp.*, 896 F.2d 1384, 1380 [ ] (2d Cir.1990). "The relevant inquiry is whether the nature of [the] adversary proceeding, rather than the state or federal basis for the claim, falls within the core of federal bankruptcy power." *In re Manville Forest Products Corp., id.* at 1389; *see also In re Wood*, [825 F.2d 90, 97 (5th Cir.1987)];

*In re Arnold Print Works, Inc.*, [815 F.2d 165, 169 (1st Cir.1987)].

*In re Harbor Park Assoc. Ltd. Partnership*, 112 B.R. 555, 558 (S.D.N.Y.1990). It is interesting to note that the Bureau, a state agency whose interests and policies will be substantially impacted by a determination by this Court, has not only consented to this Court's jurisdiction of these matters and therefore opposes Aetna's motions to dismiss or stay these proceedings, but has also filed its own Cross–Claims against Aetna and has joined in the Debtors' motion for partial summary judgment.

The recent Second Circuit case, *In re Ben Cooper, Inc.*, 896 F.2d 1394, 1398 (2d Cir.1990), supports finding a broad jurisdictional mandate. In *Ben Cooper*, the court found that in the context of § 157(b)(2)(A) "[t]he statements of several influential legislators ... indicate that bankruptcy jurisdiction was to be construed as broadly as possible within the constitutional constraints of *Marathon*." *Id.* Moreover, the Second Circuit agreeing with the First Circuit's analysis of the legislative history of § 157 stated as follows:

"the legislative history of [§ 157] indicates that Congress intended that 'core proceedings' would be interpreted broadly, close to or congruent with constitutional limits. The sponsors repeatedly said that 95 percent of the proceedings brought before bankruptcy judges would be core proceedings. *See* 130 Cong.Rec. E1108–1110 (daily ed. March 20, 1984) (statement of Representative Kastenmeier); *id.* at H1848, H1850 (daily ed. March 21, 1984) (statement of Representative Kindness).

*In re Ben Cooper, Inc.*, 896 F.2d at 1398 (quoting *In re Arnold Print Works, Inc.*, 815 F.2d 165, 168 (1st Cir.1987)).

■ This Court also finds that jurisdiction is proper in this instance because the dispute involves property of the estate. The filing of a petition in bankruptcy creates an estate that encompasses "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). This provision has been broadly construed. "The scope of

[§ 541(a)(1) ] is broad. It includes all kinds of property, including tangible or intangible property, causes of action ... and all other forms of property currently specified in Section 70a of the Bankruptcy Act." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 9, 103 S.Ct. 2309, 2313 n. 9, 76 L.Ed.2d 515 (1983) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5868).

> The [Supreme] Court [in *Whiting Pools* ], explained that 'both the Congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggests that Congress intended a broad range of property to be included in the estate.'

*MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89, 92 (2d Cir.1988) (quoting *United States v. Whiting Pools, Inc.*, 462 U.S. at 204, 103 S.Ct. at 2313; *accord Johns–Manville Corp. v. Asbestos Litigation Group (In re Johns–Manville)*, 40 B.R. 219, 230 (S.D.N.Y.1984)).

It is well established under the law of Pennsylvania that a principal cannot maintain a suit against his surety to compel performance. *See e.g., Tooks v. Indemnity Insurance Co.*, 381 Pa. 607, 114 A.2d 135 (1955). Accordingly, Aetna argues that the Debtors have no legal or equitable interest in the surety bonds. In support of its assertion, Aetna relies on several cases in which courts have held that a surety bond did not constitute property of the estate. *In re Mansfield Tire and Rubber Co.*, 660 F.2d 1108 (6th Cir.1981); *In re Apache Construction, Inc.*, 34 B.R. 415 (Bankr.D. Or.1983); *In re Fintel*, 10 B.R. 50 (Bankr. S.Or.1981); *In re Buna Painting & Drywall Co., Inc.*, 503 F.2d 618 (9th Cir.1974). However, Aetna has failed to persuade this Court that LTV Steel has neither a legal nor equitable interests in the bonds. Instead, this Court finds the reasoning of the court in *In re Wegner Farms Co.*, 49 B.R. 440 (Bankr.N.D.Iowa 1985), more compelling under the circumstances.

> To the extent these cases can be read as merely holding that a Debtor has no interest in the penal sums intended for the benefit of the third party claimants,

this Court passes no judgment on these decisions. To the extent, however, these decisions can be construed as holding that debtor as a contracting party to the bonding agreement has no legal or equitable interest in the contract, this Court concludes these decisions are incorrect as a matter of law.

*Id.* at 443.

■ The bonding agreements are valid contracts, for which the Debtors bargained and paid valuable consideration. Contractual rights are intangible property which is included within the definition of the estate of the debtor. *Id.; see also, In re Titan Energy*, 837 F.2d 325 (8th Cir.1988).

Additionally, employee good will and contentment is an asset which is vital to the continuation of a debtor's business operation and its ability to effectively reorganize during the Chapter 11 process. *See, In re Inslaw Inc.*, 88 B.R. 484, 488–89 (Bankr.D. C.1988). In granting Debtors' applications for permission to provide hardship payments to injured workers, this Court determined that the uninterrupted payment of LTV Steel workers' compensation obligations is essential to employee morale and industrial tranquility which, in turn, are critical to a successful reorganization. Consequently, since the actions taken by Aetna have impacted assets of these estates, this Adversary Proceeding constitutes a core proceeding. *See, MacArthur Company v. Johns–Manville Corp.*, 837 F.2d at 92.

■ This declaratory judgment action also falls within the jurisdiction provided by § 157(b)(2)(O) because it will directly affect the debtor-creditor relationship. As stated previously, Aetna and National have filed at least forty-two proofs of claim relating to the Pennsylvania workers' compensation surety bonds in these cases seeking aggregate recovery of over $58 million. These proofs of claim seek recovery with respect to the surety bonds which are the subject of this action. Resolution of these claims requires resolution of the extent of Aetna's liabilities. Aetna has consented to this Court's jurisdiction over their claims as

creditors by filing numerous proofs of claim relating to the bonds at issue. *See, In re Depo*, 40 B.R. 537, 542 (N.D.N.Y. 1984) (holding that filing a proof of claim implies consent to bankruptcy court jurisdiction over counterclaims asserted by debtor which are related to the claim). *See also, In re Lombard–Wall, Inc.*, 44 B.R. 928 (Bankr.S.D.N.Y.1984); *In re Lombard–Wall Inc.*, 48 B.R. 986 (S.D.N.Y.1985); *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). It is clear that a declaratory judgment as to Aetna's liability on these bonds will affect its claims against LTV Steel. As such, it will effect an adjustment of the debtor-creditor relationship. *See, In re Ermco Erectors, Inc.*, 69 B.R. 233, 234 (Bankr.E.D.N.Y.1986). Aetna's argument that a determination in this matter will only affect which party has a claim against the estate, but not the amount of the claim, is unpersuasive. The fact that the beneficiary of a surety bond, and a surety who pays that beneficiary and assumes the claim of the beneficiary against the estate, both have an unsecured claim does not preclude a determination that the beneficiary and the surety are not entitled to identical treatment in a debtor's plan of reorganization. *See, In re U.S. Truck Co., Inc.*, 42 B.R. 790 (Bankr.E.D. Mich.1984).

Moreover, based upon the Debtors' third cause of action, *i.e.*, whether the Debtors are entitled to reimbursement from Aetna to the extent of any interim workers' compensation payments made by the Debtors, this is a core matter. In a separate adversary proceeding in these cases, Judge Kram for the District Court stated that in order for these Debtors to recover the cost of continuing the retiree benefits after its contractual obligations ended, it was necessary for this Court to determine if the United Mine Workers of America 1974 Benefit Plan and Trust (the "Plan & Trust") was liable for the benefits. *In re Chateaugay Corp., (LTV Steel Company, Inc., et al. v. Joseph P. Conners, Jr., et al.)*, 111 B.R. 399 (S.D.N.Y.1990). The District Court held that "[t]he resolution of the Plan & Trust's liability was a core proceeding because it was an attempt by the [Debt-

ors] to collect a post-petition debt." *Id.* at 406. Similarly, here, in order for the Debtors to recover the cost of continuing to provide interim workers' compensation payments, it is first necessary as a threshold matter to determine whether Aetna is liable for such payments.

Judge Kram also held as follows:

The payment of retiree benefits by the Debtors was an administrative activity. The recovery of those monies which the Debtors paid after their obligation had ceased is a core proceeding. Also, LTV's ability to recover the amount paid is a matter that effects the final administration of the estate under § 157(b)(2)(A).

*In re Chateaugay Corp., supra,* at 406. Although in this instance, it is undisputed that LTV Steel is primarily liable for paying the workers' compensation benefits, its ability to be reimbursed by Aetna, should it be determined that Aetna is liable as a surety under the bonds at issue in this dispute, is clearly a core matter which affects the administration of these estates. "The collection of a post-petition debt is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O)." *Id.; see, In re Arnold Print Works, Inc.*, 815 F.2d 165, 168 (1st Cir.1987); *In re Sattlers, Inc.*, 82 B.R. 229, 232 n. 4 (Bankr.S.D.N.Y.1988).

In accordance with the foregoing discussion, this Court finds that this Adversary Proceeding is a core proceeding pursuant to § 157(b)(2)(A) and (O).

2) *Whether LTV Steel has standing to commence this Adversary Proceeding.*

■ Aetna also asserts that the Debtors do not have standing to commence this declaratory action and therefore the Debtors' first cause of action in its complaint must be dismissed pursuant to Federal Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Although the standing of the Debtors to bring suit is implicit in the above "core holding", the issue of standing under these circumstances can and should be addressed independently as it is at the heart of Aetna's dismissal/abstention contentions.

In order to have standing, the Debtors must establish that they are the "proper plaintiff to raise the issues sought to be litigated" in their declaratory judgment action. *S. v. D.*, 410 U.S. 614, 616, 93 S.Ct. 1146, 1147, 35 L.Ed.2d 536 (1973). They "must allege some threatened or actual injury" before this Court may assume jurisdiction. *Id.* Such injury must directly impact their own legal rights and interests; it is not sufficient that the Debtors' claim for relief rests on the legal rights and interest of third parties. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

It is well established under the law of Pennsylvania that a principal cannot maintain a suit against his surety to compel performance. *See e.g., Tooks v. Indemnity Insurance Co.*, 381 Pa. 607, 114 A.2d 135 (1955). Indeed, the long standing rule is that the surety is entitled to reimbursement from the principal when the surety performs due to the principal's default. *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49 (1965); *Smith v. Harry*, 91 Pa. 119 (1879); *Continental Bank v. Axler*, 353 Pa.Super. 409, 510 A.2d 726 (1986); *Maryland Casualty Co. v. Mullett*, 295 F.Supp. 875 (W.D.Pa.1969). Consequently, Aetna argues that the Debtors cannot satisfy the burden of establishing standing because the Debtors have failed to allege or show that their request for declaratory relief will address or redress a threatened or actual injury to them. Aetna also asserts that giving the Debtors standing to pursue this action would stand the law of suretyship on its head. However, Aetna's position in this regard is without merit.

The Debtors were not a "mere volunteer" in seeking permission to pay injured workers hardship payments. The Debtors were forced to seek those orders to make the payments as a result of the dispute between the Bureau and Aetna as to the extent of Aetna's liability under the surety bonds. It is undisputed that those orders were necessary for the administration of the Debtors' estates.

As noted by the United States Supreme Court, no justiciable case or controversy exists where, the plaintiff fails to raise issues or facts showing such a personal stake or direct interest in the outcome as to justify Plaintiffs' invocation of federal court jurisdiction. *S. v. D.*, 410 U.S. at 616, 93 S.Ct. at 1147; *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The Debtors have clearly been placed in an untenable position. Although it is undisputed that the Debtors have no standing under state law to seek a declaration as to the extent of Aetna's liability, the Debtors cannot be forced to sit idly by while assets of these estates dissipate awaiting the outcome of a dispute in which it cannot participate. Although the Debtors in their first cause of action are seeking a determination of the Bureau's rights or obligations, the Debtors have clearly demonstrated a personal stake or direct interest in the outcome of this litigation to warrant a finding of standing.

In accordance with the foregoing discussion, this Court hereby denies Aetna's motions to dismiss the Debtors' first cause of action and the Bureau's Cross–Claims[9].

3) *Whether summary judgment is appropriate in this instance on behalf of either Aetna or the Debtors.*

The Debtors seek judgment that as a matter of law the bonds at issue were terminated in compliance with the terms of the bonds themselves, and therefore remain effective to provide coverage for injuries occurring prior to the dates on which each of the bonds terminated. The Debtors assert that the sole issue before this Court is to determine the coverage provided by the words of the bond. Moreover, they argue that there is no dispute among the parties as to the issuance of the bonds, and that their provisions are clear and unambiguous. Thus, the Debtors conclude that judgment may be rendered without reference to extraneous evidence and therefore summary judgment is appropriate.

---

**9.** Pursuant to Bankruptcy Rule 5011(b), a separate *Report And Recommendation* on Aetna's motion for abstention has been filed with the District Court.

In contrast, Aetna cross moves for summary judgment asserting that the pre-existing bonds were not "terminated" pursuant to ¶ 2 of the bonds. Rather, Aetna maintains that the bonds were replaced with the mutual consent of all parties and at the request of the Bureau. Aetna argues that its obligation was consolidated under one bond to reflect the new corporate principal. Aetna contends that based upon the legal theories of novation, estoppel, reformation, and merger, its liability is limited to the replacement bond, No. 018 S 71955, in an amount not to exceed $27 million.

Pursuant to Federal Rule 56 as made applicable herein pursuant to Bankruptcy Rule 7056, summary judgment is appropriate when there is no material fact in dispute and the court may decide the issues as a matter of law. Federal Rule 56(c); Bankruptcy Rule 7056; *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980). The court's role in ruling on a motion for summary judgment is to determine whether there exists a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where the movant demonstrates the lack of any genuine issues of material fact to be tried, summary judgment is appropriate. *In re O.P.M. Leasing Services, Inc.*, 46 B.R. 661, 665 (Bankr.S.D.N.Y.1985). However, the court must deny summary judgment where there exists disputes over facts that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment has frequently been issued where a court has been requested to interpret the terms of a contract. *Tokio Marine Fire Ins. v. McDonnell Douglas Corp.*, 617 F.2d 936, 940 (2d Cir.1980); *Parish v. Howard*, 459 F.2d 616, 618 (8th Cir. 1972); *Freeman v. Continental Gin Co.*, 381 F.2d 459, 465 (5th Cir.1967); *Nat'l Util. Serv., Inc. v. Whirlpool Corp.*, 325 F.2d 779, 781 (2d Cir.1963); *In re Tikijian*, 76 B.R. 304 (Bankr.S.D.N.Y.1987).

Cases with a complex factual record may be appropriately disposed of on summary judgment; the complexity of factual issues alone cannot justify denial of summary judgment. *See, Apex Oil Co. v. DiMauro*, 641 F.Supp. 1246, 1255–57 (S.D.N.Y.1986), *aff'd in part, rev's in part on other grounds*, 822 F.2d 246 (2d Cir.1987). Both the Supreme Court and the Second Circuit "have encouraged the use of summary judgment in complex cases to avoid unnecessary trials." *H. L. Hayden Co. of N.Y., Inc. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1011–12 (2d Cir.1989). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. at 327, 106 S.Ct. at 2554. *Accord, Knight v. United States Fire Insur. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. den.* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

Even when the question of a party's belief is at issue, there are circumstances in which summary judgment is appropriate. *Morgan v. Prudential Group, Inc.*, 527 F.Supp. 957, 959 (S.D.N.Y.1981), *aff'd*, 729 F.2d 1443 (2d Cir.1983). The "rule" that summary judgment should be reluctantly granted where state of mind is at issue should not preclude granting such a motion in the absence of a material fact issue. *Guitar v. Westinghouse Electric Corp.*, 396 F.Supp. 1042, 1053 (S.D.N.Y. 1975), *aff'd*, 538 F.2d 309 (2d Cir.1976).

Based upon all of the pleadings, the affidavits and the exhibits submitted, this Court finds that there are no genuine issues of material fact which would preclude the granting of summary judgment in this instance. Consequently, in accordance with the discussion to follow, Aetna's request for summary judgment is hereby granted, and the Debtors' motion for partial summary judgment is hereby denied.

4) *Whether parol evidence is admissible.*

The Debtors and the Bureau contend that pursuant to the express language of the termination provisions of each workers' compensation surety bond in dispute,

Aetna is liable, with respect to injuries occurring to workers prior to termination, for the full penal sum of any bond in effect at the time of termination. In response, Aetna argues that the termination provisions are inapplicable because the bonds were "cancelled" or "replaced", rather than "terminated".

■ This Court agrees with the Debtors that based upon the plain meaning of the language of the bonds, the termination of a bond only limits Aetna's prospective liability—not its retroactive liability. However, the issue which must be decided is not what Aetna's liability would be upon termination of a bond, but rather, if, indeed, the bonds were "terminated" as contemplated by the language of the bonds themselves.

Each of the Aetna surety bonds provides coverage for the workers' compensation obligations of the named principals for injuries occurring prior to their termination dates. Each of the bonds contains specific termination procedures, which, if employed, may limit the surety's exposure with respect to liability for future injuries, but does not limit the surety's liability for injuries which occurred prior to the termination, up to the face value of the bond. Thus, ¶ 2 of each of the surety bonds reads:

> 2. This is a continuous bond and shall remain in force and effect until terminated by the Surety, as hereinafter provided, or until the Principal's status as a self-insurer has been revoked or terminated by the Director, and in either of such events the Surety shall have no further liability except for the said obli-

gations of the Principal; including a rateable part of the assessments for the current period, preexisting or incurred during or with respect to any period prior to the termination of the this bond. *Such termination shall not relieve the Surety of liability for obligations of the Principal arising from injuries and occupational diseases that occur prior to the effective date of such termination.* (emphasis added).

Accordingly, the Debtors assert that Aetna remains liable with respect to each of the five surety bonds for amounts payable in the future with respect to obligations which were incurred prior to the termination dates of each of the bonds. Thus, the Debtors conclude that the aggregate value of Aetna's liability is $51 million. The Debtors also assert that parol evidence precludes admission of Aetna's proffered evidence in the form of correspondence between the parties and affidavits.

■ In interpreting the nature and scope of a surety bond, courts are guided by contract principles [10]. *See, e.g., County of Erie v. American States Ins. Co.,* 573 F.Supp. 479, 483 (W.D.Pa.1983); *aff'd,* 745 F.2d 45 (3d Cir.1984). In determining the intent of the parties the court has a duty to ascertain the intent as manifested in the language of the agreement. *St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co.,* 655 F.2d 521 (3rd Cir.1981); *Mohn v. American Casualty Co.,* 458 Pa. 576, 326 A.2d 346 (1974). If the terms of the agreement are clear from the face of the document, the intent of the parties is found

---

**10.** The Supreme Court has held that in actions on contracts made and to be performed in states other than the forum state, the rights and liabilities of the parties shall be established following a determination as to whether the laws of the forum state or the other state shall apply. This determination shall be made according to the forum state's rule in the field of conflict of laws. *See, Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). So long as no policy of the Code would be offended, a court is free to apply the *Klaxon* rule in the bankruptcy forum. *See, Fore Improvement Corp. v. Selig,* 278 F.2d 143, 147 (2d Cir.1960).

In applying the *Klaxon* rule, this Court relies on the conflict of law rules of the State of New

York, the forum state. In the leading case determining New York's rule on conflict of laws, *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99 (1954), New York's highest court adopted the "center of gravity" or the "grouping of contracts" theory with respect to choice of law in contract cases. *Id.* 308 N.Y. at 160, 124 N.E.2d at 101–102.

In applying the "center of gravity" test, this Court notes that, as the surety bonds are contracts which were made in Pennsylvania, and that the parties are in agreement that the laws of Pennsylvania should be applied, the applicable substantive law is that of Pennsylvania. *See, In re PCH Associates,* 55 B.R. 273 (Bankr.S. D.N.Y.1985), *aff'd,* 60 B.R. 870 (S.D.N.Y.1986); *aff'd,* 804 F.2d 193 (2d Cir.1986).

in the document. *Vogel v. Berkley*, 354 Pa.Super. 291, 511 A.2d 878 (1986); *American Home Products Corp. v. Liberty Mutual Insurance Co.*, 748 F.2d 760, 765 (2d Cir.1984). However, the "court must adopt the construction which gives effect to the parties reasonable and probable intent in view of the surrounding circumstances and the purposes of the contract." *Kohn v. Kohn*, 242 Pa.Super. 435, 364 A.2d 350, 353 (1976). *See also, D'Huy v. D'Huy*, 390 Pa.Super. 509, 568 A.2d 1289 (1990).

The admissibility of extrinsic written or oral evidence which modifies or varies the terms of a contract is determined by the parol evidence rule. Although frequently dealt with as a rule of evidence, the parol evidence rule is actually a rule of substantive law. *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988); *see,* 3 *Corbin on Contracts,* § 573 (1960). The rule prevents alteration of an integrated contract by extrinsic evidence. *Id.; see, In re PCH Assoc.*, 55 B.R. at 279. Integration is determined by whether the terms of the contract are clear, definite, and complete on their face. 3 *Corbin on Contracts* at § 573. Typically, the court will look to whether the contract on its face represents the entire understanding of the parties, whether the contract contains any ambiguous terms, and whether there is any objective reason to look outside the document to interpret its meaning. *See, McGuire v. Schneider Inc.*, 368 Pa.Super. 344, 534 A.2d 115 (1987), *aff'd,* 519 Pa. 439, 548 A.2d 1223 (1988). When the terms are ambiguous or subject to interpretation by the parties, parol evidence may be admitted to determine the contract's meaning. 3 *Corbin on Contracts* at § 579; *see, In re PCH Assoc.*, 55 B.R. at 280. This includes both internal ambiguity which springs from the words of the contract, as well as external ambiguity which springs from the words of the contract within the context of the circumstances of the contract. *Metzger v. Clifford Realty Corp.*, 327 Pa.Super. 377, 476 A.2d 1 (1984).

Although the parties seem to be in agreement that the bonds are clear on their face and that the language contained therein is neither vague nor ambiguous, this Court disagrees. This entire dispute turns on the application of the word "terminated", however, there is no definition for the term provided within the four corners of the bonds. Aetna argues that the termination provisions are inapplicable because the bonds were "no longer required," "cancelled" or "replaced", rather than "terminated". In contrast, the Debtors assert that Aetna's interpretation of the term is tortured and that the terminology used by Aetna is consistent with the language of the bonds themselves.

When two parties disagree as to the meaning of a contractual term, parol evidence may be admitted to extinguish any ambiguity. The courts have often looked to extrinsic evidentiary sources when defining an ambiguous term. *See e.g., DeWitt v. Kaiser*, 335 Pa.Super. 258, 484 A.2d 121 (1984) (court defines "income"); *Lohmann v. Piczon*, 338 Pa.Super. 485, 487 A.2d 1386 (1985) (court defines "net income"); *Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 473 A.2d 584 (1984) (court defines "marketable bituminous coal"). *See also, Mellon Bank, N.A. v. Aetna Business Credit, Inc.* 619 F.2d 1001 (3d Cir.1980), *In re Fessman*, 386 Pa. 447, 126 A.2d 676 (1956); *Pavlich v. Ambrosia Coal & Construction Co.*, 441 Pa. 210, 273 A.2d 343 (1971). "[B]oth parties are entitled to present evidence outside the four corners of the agreement that bears on the meaning and application of the several clauses." *Garza v. Marine Transport Lines, Inc.*, 861 F.2d at 26.

For example, in *Metzger v. Clifford Realty Corp.*, 327 Pa.Super. 377, 476 A.2d 1 (1984), the court faced the question of whether the termination clause of a sale agreement was ambiguous, and therefore allowed for the entertainment of parol evidence. The court held that despite the clear "definition of the word 'terminate'," the clause failed for "indefiniteness of expression." *Id.* 476 A.2d at 6. The court pointed to the ambiguity of the word in the context of the contract, as well as the failure of the provisions of the contract to

shed light on the phrase. Moreover, the court held that "more precise language denoting [what was meant by the term] would have put this matter beyond reasonable question. In the absence thereof, however, the meaning of that language is ambiguous." *Id.* at 7.

■ Parol evidence may also be introduced when the following circumstances exist: (1) when contracts are standardized forms, parol evidence may be admitted to show the meaning of terms. *Rest., Contracts* at § 211; (2) when terms are subject to common trade usage, parol evidence may be admitted to show which interpretation of a term is the more generally known within the trade. *Id.* at §§ 221, 222; (3) when there has been a course of dealing between the parties which has established a common understanding, parol evidence may be admitted to supplement a contract. *Id.* at § 223.

■ Moreover, parol evidence is admissible to establish a new and distinct agreement upon a new consideration. *In re Westbrook Foods, Ltd.*, 7 B.R. 100 (Bankr.E.D.Va.1980). A contract may not be altered by evidence pertaining to its formation, however it may be altered or discharged by a new agreement. "Today may control the effect of what happened yesterday; but what happened yesterday cannot change the effect of what happens today." 3 *Corbin on Contracts*, § 574 at 372. The Pennsylvania courts allow the "parties to a written agreement [to] introduce parol evidence as to subsequent modifications of written agreements." *Malesh v. Chechak*, 342 Pa.Super. 446, 493 A.2d 106 (1985). Courts have also recognized that a substituted contract may be established by extrinsic evidence including other writings, words, conduct or by all three. *Buttonwood Farms, Inc. v. Carson*, 329 Pa.Super. 312, 478 A.2d 484 (1984); *Wagner v. Graziano Construction Co.*, 390 Pa. 445, 136 A.2d 82 (1957). Furthermore, evidence tending to show that a fundamental assumption of the parties was not expressed in the writing should not be excluded by the parole evidence rule. 3 *Corbin on Contracts* at § 590.

Additionally, the language of the bonds themselves also compels this Court to look beyond the four-corners of the document in order to determine whether the bonds have been terminated. The surety bonds provide that the bonds may be terminated in the following manner:

3. This bond may be terminated by the Surety by written notice of its intention to do so filed in the Office of Director of the Bureau of Workmen's Compensation, and by giving written notice thereof to the Principal, in which event the Surety's liability shall terminate at the expiration of forty-five (45) days from the date of such filing and not earlier, subject however to the provisions of paragraph 2.

Therefore, even if the Debtors are correct in their assertion that the bonds were in fact terminated, such a determination clearly cannot be made by examining only the bonds themselves. Rather, this Court must also examine the various correspondence between the parties in order to determine whether or not the termination provision in ¶ 2 had been activated.

Based upon the above discussion, this Court finds that there is ample justification under these circumstances to admit parol evidence in order to establish whether the four bonds were "terminated".

5) *Whether the affidavits submitted should be stricken.*

■ Filed contemporaneously with its cross-motion for summary judgment, Aetna also filed its motion to strike the affidavits submitted by the Debtors for failure to comply with the requirements of Federal Rule 56(e) and Bankruptcy Rule 7056. Although the Debtors have not formerly moved to strike Aetna's affidavits, they have objected to their admissibility on various grounds in support of their own motion for summary judgment and in opposition to Aetna's cross-motion.

Federal Rule 56(e) states, in pertinent part:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible

in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

"[T]he policy of Rule 56(e) is to allow the affidavit to contain all evidentiary matter, which, if the affiant were in court and testifying on the witness stand, would be admissible as part of his testimony." 6 *Moore's Federal Practice* at ¶ 56.22[1] (2d ed. 1988).

Although as discussed previously, this Court will allow parol evidence to be admitted in order to ascertain the intent of the parties, the affidavits submitted by both parties are either inadmissible or, if admissible, not entitled to any weight, to the extent that they merely show the affiant's subjective intent. Generally speaking, the affidavits contain post hoc, self-serving statements about the affiants' view of the intent of the parties involved in the transaction. The documents which the affidavits purport to interpret have all been submitted and are part of this record. Where proof is to be made of a fact which is recorded in a writing, the best evidence of the contents of the writing consists of the document itself. 29 Am.Jur.2d *Evidence* § 448 (1967). "The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description...." *Gordon v. United States*, 344 U.S. 414, 421, 73 S.Ct. 369, 374, 97 L.Ed. 447 (1953). Thus, pursuant to the best evidence rule, this Court finds that the correspondence and other documents speak for themselves and therefore the affidavits, to the extent that they are submitted to show subjective intent, are neither necessary nor relevant, and will therefore be disregarded.

 Nevertheless, portions of the affidavits submitted which are based on personal knowledge and do not deal with the subjective intent of the affiant are admissible. For example, portions of the affidavits of Jan Smith, former Director of the Pennsylvania Bureau and Reta Davis, Manager of the Self–Insurance Section of the Bureau, submitted by Aetna to show Bureau protocol are clearly relevant and therefore admissible. The Debtors' assertion that Mr. Smith's affidavit should be disregarded because it flatly contradicts a letter he sent to Aetna on August 1, 1986 in which he states that all of the Aetna surety bonds are in effect and demands payment on those bonds on behalf of the Bureau, is not compelling in this instance. The portions of Mr. Smith's affidavit which are deemed admissible involve only the Bureau's internal procedures and do not go to his subjective intent. "Even if an affidavit does contain some inadmissible matter, the whole affidavit need not be stricken or disregarded; the court may strike or disregard the inadmissible parts and consider the rest of the affidavit." 6 *Moore's Federal Practice* at ¶ 56.22[1].

6) *Whether a novation or substitution of contract occurred.*

 The Debtors assert that even if parol evidence is admissible, a fair reading of the documents upon which Aetna relies discloses that they are entirely consistent with the plain meaning of the language of the bonds which contemplates Aetna's continuous liability in this instance on all five bonds. Thus, the Debtors argue that no novation or substitution occurred when Aetna's surety bond No. 018 S 71955, in the penal sum of $27 million, was issued. Instead, the Debtors maintain that the other four bonds were merely "terminated" pursuant to the language of the bonds in question which triggers Aetna's retrospective liability up to the penal sum of $51 million.

As can be seen from the following, an application of the law to the undisputed material facts clearly establishes that based upon the intent and understanding of the parties, only Aetna's surety bond No. 018 S 71955 in the penal sum of $27 million is available as security for the default of LTV Steel on its Pennsylvania workers' compensation obligations.

In 1979, Aetna had three surety bonds in place for three separate companies. In 1981, a merger occurred effectively combining those three companies. As a consequence of the merger, the initial correspon-

dence, originating from the Bureau, requested that a "new" surety bond be issued naming the successor corporation as the principal. [*See* Aetna's Document 1]. Conspicuously absent from this letter was a request by the Bureau for the written notice by Aetna to both the Bureau and the Debtors which would comport with the language of ¶ 3 indicating an intent by the parties that the surety bonds would be "terminated". Indeed, there is not one document submitted by any of the parties which fulfills the requirement of ¶ 3 and would demonstrate an intent that the termination liability would be triggered. The Court is unpersuaded by the Debtors argument that the term "replacement" which is repeatedly used in the correspondence between the parties is consistent with the intent of the parties to "terminate" the surety bonds.

According to Black's Law Dictionary (5th ed. 1979), the term "terminate" means "[t]o put an end to; to make to cease; to end". Although there appears to be no reported case which has dealt with the definition of the word "terminate" in the context of a surety bond, the word "termination" for purposes of insurance, "refers to the expiration of a policy by lapse of the policy." *Waynesville Sec. Bank v. Stuyvesant Ins. Co.*, 499 S.W.2d 218, 220 (Mo.App.1973).

In contrast, "replacement" is defined as "the action or process of replacing: the state of being replaced: SUBSTITUTION". Webster's Collegiate Dictionary, (3d ed. 1981). The term "replace" given its plain, ordinary meaning, means to supplant with substitute or equivalent. *Olenick v. Government Employees Ins. Co.*, 346 N.Y. S.2d 320, 42 App.Div.2d 760 (1973). Black's Law Dictionary, 5th ed., also defines replace as "[t]o take the place of".

Moreover, Reta Davis, Manager of the Self–Insurance Section of the Bureau stated in ¶ 4 of her affidavit:

The term "replacement" is a term-of-art in the Bureau. As used in the Bureau, "replacement" means supplanting of an existing bond by the issuance of substitute bond. In a "replacement", the liabil-

ity of the replaced bond(s) is extinguished.

Affidavit of Davis, at ¶ 4. Additionally, Jan Smith, the former Director of the Bureau provided in ¶ 3 of his affidavit as follows:

The word "replacement" is a term of art when used by the Bureau, in relation to worker's compensation self-insurance bonds. The term "replacement," when used by the Bureau, meant the supplanting of an existing bond by the issuance of a substitute bond.

It can therefore be concluded that the term "terminate" and "replacement" each have a distinct meaning and are not interchangeable. Additionally, the other terminology used in the parties' correspondence such as "no longer required," "will be sufficient" and "cancelled" are not sufficiently analogous to the term "terminate" to warrant the triggering of Aetna's liability on all five bonds. The parties to this transaction are all sophisticated entities. Had they intended to trigger Aetna's liability pursuant to the termination provision in ¶ 2 of the surety bond, they would have stated so in unequivocal terms. Consequently, this Court finds that the issuance of the new surety bond in response to the request of the Bureau constituted a substituted contract or novation discharging Aetna's obligation on the prior bonds. The writing, words, and conduct of Jones & Laughlin/LTV, the Bureau, Marsh & McLennan, Inc. (the broker to these transactions) and Aetna all lead to the inescapable conclusion that the parties intended the substitution of bond No. 018 S 71955 and the extinction of liability under bonds Nos. 018 S 69174, 018 S 69175, 018 S 68212, and 018 S 100071193.

■ While the courts have frequently used the terms novation and substituted contract interchangeably, there is a technical distinction. A substituted contract is one that is accepted in satisfaction of the original contract and thereby discharges it. A novation is a substituted contract that includes a party who was not part of the original contract. *See, Rest., Contracts*, 2d, §§ 279, 280. A review of the legal

precedents clearly establishes that the bond replacements qualify as both a substituted contract and novation.

The required elements of a substituted contract or novation are set forth in *Yoder v. T.F. Scholes, Inc.*, 404 Pa. 242, 173 A.2d 120 (1961) as follows:

1. the displacement and extinction of a valid contract;
2. the substitution for it of a valid new contract;
3. a sufficient legal consideration for the new contract; and
4. the consent of the parties.

*Id.* 173 A.2d at 121; *see also, Schmucker v. Hanna,* 377 Pa.Super. 301, 547 A.2d 379 (1988).

■ A novation occurs when the parties to a contract mutually agree to relieve one another from liability on a valid contract and to substitute a new contract in place of the old one. *First Pennsylvania Bank, N.A. v. Triester,* 251 Pa.Super. 372, 380 A.2d 826 (1977). Since a substituted contract is accepted as satisfaction of a pre-existing duty, it bars the revival of the pre-existing duty following a breach of the substituted contract. *Nowicki Construction Co. v. Panar Corp., N.V.,* 342 Pa.Super. 8, 492 A.2d 36 (1985). As the District Court stated in *National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622 (S.D.N.Y.1978), *aff'd,* 597 F.2d 314 (2d Cir.1979):

> [A] substitute contract -operates as its name implies—as an immediate discharge and satisfaction of existing claims in return for the new contract, even though performance is to commence in the future. Should a breach later occur, the creditor is limited to his rights under the substitute agreement. *Restatement, Contracts,* Section 418 (1932); 6 *Corbin* § 1269 at 81–2.

448 F.Supp. at 643.

■ A novation may be established by evidence of an express understanding or by circumstances showing such assent. *First Pennsylvania Bank, N.A. v. Triester,* 380 A.2d at 831. A novation may be implied or inferred from all surrounding circum-stances. *In re Stader,* 90 B.R. 29, 32 (Bankr.D.Conn.1988). As discussed previously, the intention of the parties to effect a novation or substituted contract may be shown by other writings, words, conduct or by all three. *Buttonwood Farms, Inc. v. Carson,* 329 Pa.Super. 312, 478 A.2d 484, 487 (1984).

■ The party asserting the existence of a novation has the burden of proving that the later agreement was specifically intended as a complete substitute for the prior agreements. *American Acceptance Corp. v. Scott Housing Sys., Inc.,* 630 F.Supp. 70, 75 (E.D.Pa.1985) (citing *First Pennsylvania Bank, N.A. v. Triester, supra* ).

The Debtors assert that Aetna has failed to establish a novation or substitution in this instance because there is no language in the new bond which would demonstrate such an intent. It is well established that evidence which courts find probative of an intent to extinguish an old contract and to accept a new contract as a full substitute includes language in the second contract expressly stating that it supplants the earlier agreement. *Nowicki Constr. Co. v. Panar Corp., N.V.,* 492 A.2d at 40; *National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622 (S.D.N.Y. 1978), *aff'd,* 597 F.2d 314 (2d Cir.1979). Courts also find the surrender of the original contract, annuity, or note a clear indication of the parties' intent to extinguish the rights and obligations under the original contract. *See, Hong v. Teachers Ins. and Annuity Ass'n,* 718 F.2d 871, 872 (8th Cir. 1983); *see also, First Pennsylvania Bank, N.A. v. Triester, supra; Nikimiha Securities Ltd. v. Trend Group Ltd.,* 646 F.Supp. 1211 (E.D.Pa.1986). However, in this instance it is undisputed that the bond language was prepared by the Bureau. [*See,* Affidavit of Reta Davis at ¶ 7; Aetna's Document 1]. Accordingly, the Debtors' assertion that any ambiguity must be construed against Aetna is misplaced under these circumstances.

**A. The 1981 Transaction**

The elements of a substituted contract or novation are found in a chronological re-

view of the correspondence and documents. On June 30, 1981, H.V. Knighton, Chief of the Operations Evaluation Division of the Bureau, agreed to the cancellation of the bonds filed "on behalf of the merged subsidiaries" upon receipt of a "*new* surety bond" on behalf of the successor corporation. [*See,* Aetna's Document 1]. This letter in itself establishes the factual predicate of a novation and substituted contract. Knighton's authorization to extinguish liability on the pre-existing bonds was conditioned upon submission of a replacement bond and proof of the merger. Aetna's liability on the risk was to continue but was evidenced by a new bond on behalf of the successor corporation. Further proof of the substitution is found in the requested penal sum. Knighton's requested penal sum for the replacement bond on behalf of the successor corporation was $17 million, the exact total of the three pre-existing bonds. The specification of identical penal sums further evidences that the Bureau intended a substitution of contracts.

On July 20, 1981, Dan Minnick of Jones & Laughlin responded to the Bureau. The letter provided in pertinent part as follows:

Thank you for making the changes in the self-insurance status for our company which resulted from our corporate reorganization. In doing so you requested that the security bond amount of $17 million be provided by the new corporation. *While we recognize that this is the total of all bonds previously filed,* we would appreciate your reviewing the security requirements in lieu of our changed organization and improved financial status.

[*See,* Aetna's Document 2, emphasis added]. The Bureau agreed to reduce the penal sum to $12 million. [*See,* Aetna's Document 3].

In her correspondence of July 28, 1981, Veronica Kelcha, Insurance Administrator of Jones & Laughlin, stated that the consolidated bond "will *replace* the existing workers' compensation bonds for Jones & Laughlin Steel Corporation (018 S 68212), General Alloy Casting Company (018 S 69175), and Nemacolin Mines Corporation (018 S 69174)." [*See,* Aetna's Document 4, emphasis added].

Ralph Burt, of the bond department of Aetna's Dallas office memorialized his phone conversation with Brenda Martin of the broker, Marsh & McLennan. Martin requested authority for a bond "*replacing*" the pre-existing bonds. [*See,* Aetna's Document 6, emphasis added]. Aetna states that with that understanding, Aetna granted authority to issue the replacement bond. On August 4, 1981, Brenda Martin of the broker prepared the Bond Order and Report Blank for bond No. 018 S 71955 in the amount of $12 million. In the remarks section of the application, she wrote that "[t]his bond *replaces* Bond # 018 S 68212 (J&L), Bond # 018 S 69174 (Nemacolin Mines) & Bond # 018 S 69175 (General Alloy Casting).... We are closing all 3 bonds as of July 1, 1981." [*See,* Aetna's Document 7, emphasis added]. On the same day, Martin forwarded the bond to Jones & Laughlin, stating that she was "requesting that Aetna cancel Bond No. 018 S 68212 (J&L), Bond No. 018 S 69174 (Nemacolin) & Bond No. 018 S 69175 (General Alloy)." [*See,* Aetna's Document 8]. Aetna documented the issuance of bond No. 018 S 71955, stating in the report that this bond "*replaces* Jones & Laughlin 018 S 86212; General Alloy Casting 018 S 69175; & Nemacolin Mines 018 S 69174." [*See,* Aetna's Document 10, emphasis added].

On September 8, 1981, Robert Conner, of Jones & Laughlin, wrote to the Bureau stating:

We recently *replaced* three bonds with one bond to cover our workers' compensation exposure in the State of Pennsylvania under the recent merger. The three bonds *replaced* were Bond Nos. 018S69174, 018S69175, 018S68212 all with Aetna Casualty Company and covered Jones & Laughlin, Nemacolin Mines and General Alloy.

I am attempting to cancel the three bonds in question since they have been *replaced* by the new $12 million bond. Prior to cancellation, Aetna would prefer notification from the State of Pennsylva-

nia that the three bonds in question are no longer required and, in fact, have been *replaced* by a new bond. Would you please provide me with such a statement in order that I may cancel these three bonds.

[*See*, Aetna's Document 11, emphasis added].

On October 8, 1981, Reta Davis, Manager of the Self–Insurance Section of the Bureau, responded:

This is to acknowledge your telephone communication of October 6, 1981 regarding the *replacement* bond for Jones & Laughlin Steel Corporation and Subsidiaries.

Jones & Laughlin Steel recently *replaced* three bonds with one bond to cover their security requirement for self-insurance in the State of Pennsylvania.

The three bonds *replaced* were bond Nos. 018 S 69174, 018 S 69175, 018 S 68212 all with The Aetna Casualty Company. *These three bonds are no longer required.*

Upon approval of the new bond by the Insurance Department and Attorney General's Office the Bond No. 018 S 71955 (*replacement* bond) in the amount of 12 million dollars will be sufficient.

[*See*, Aetna's Document 13, emphasis added].

The Aetna Surety Adjustment Report for each original bond states that the bond was "*replaced* by Jones & Laughlin Bond No. 018 S 71955." [*See*, Aetna's Documents 14, 15, 16, emphasis added].

On November 25, 1981, Reta Davis confirmed that bond No. 018 S 71955 was approved by the Insurance Department and the Attorney General. She also granted authority for Aetna "to cancel the bond numbers 018 S 69174, 018 S 69175 and 018 S 68212 covering Jones & Laughlin Steel Corporation, Nemacolin Mines and General Alloy Casting Company." [*See*, Aetna's Document 17]. It should be noted that in neither the October 8th nor the November 25th letters from Pennsylvania's Manager of the Self–Insurance Section does Reta Davis see fit to use the word "terminate" to describe the transaction. In her affidavit, Davis in explaining the Bureau procedure indicated:

My letter of November 25, 1981 is not in the form I would use for termination of bonds. When a bond was terminated and there was to be continuing liability for injuries occurring during the term of the bond, I had a form letter that specifically stated that the termination of the bond "does not relieve liability for the time during which the bond was in effect." My letter of November 25, 1981, which does not contain such language, is consistent with the "replacement" of bonds 018 S 69174, 018 S 69175 and 018 S 68212 rather than their termination. [Document 17].

[Affidavit of Reta Davis at ¶ 6].

Although the record is replete with correspondence from all parties referring to the transaction as a "replacement", the displacement or extinction of the three pre-existing bonds are most specifically demonstrated in four related documents, three of which were authored by the Bureau and one by Jones & Laughlin/LTV. First, on June 30, 1981, the Bureau advised that the three pre-existing bonds could be cancelled upon receipt of the replacement bond and merger documents. [*See*, Aetna's Document 1]. Second, on September 8, 1981, Jones & Laughlin wrote to the Bureau indicating that it was "attempting to cancel the three bonds in question since they have been replaced" by the new bond. Jones & Laughlin requested confirmation from the Bureau that the three bonds were "no longer required" and had been replaced. [*See*, Aetna's Document 11]. The third document is the Bureau's response of October 8, 1981. In that letter, the Manager of Pennsylvania Self–Insurance Section advised that the "three bonds are no longer required" and that the "replacement bond" would be sufficient. [*See*, Aetna's Document 13]. Finally, on November 25, 1981, the Bureau wrote to Aetna granting Aetna specific authority "to cancel" the three bonds. The correspondence notably omitted a standard caveat that there would be continuing liability on the bonds. [*See*, Aetna's Document 17].

Based upon the record as submitted, this Court does find that the three bonds were in fact replaced by the new bond issued, and not terminated. Accordingly, the first requirement for a novation has been met. The Bureau's and J & L/LTV's own correspondence establishes and grants authority for the displacement or extinction of the three pre-existing bonds. Furthermore, it appears that the cancellation was conditioned upon the second requirement, *i.e.*, the substitution of a new bond.

The second requirement for a novation is the substitution of a valid new contract. The documentation between the parties clearly establishes that the Aetna bond No. 018 S 71955 was substituted for the three pre-existing bonds. The Bureau's letter of October 8, 1981, provided that Jones & Laughlin "recently replaced three bonds with one bond to cover their security requirements for self-insurance in the State of Pennsylvania". [*See*, Aetna's Document 13]. In the same correspondence, Reta Davis specifically described bond No. 018 S. 71955 as "the replacement bond". Moreover, Davis, in her affidavit, stated that the term "replacement", when used by the Bureau, meant the issuance of a substitute bond to supplant pre-existing bonds. [Affidavit of Reta Davis at ¶ 4; *see also,* Affidavit of Jan Smith at ¶ 3]. Finally, as discussed previously, the correspondence is replete with references to the transaction as a "replacement" of bonds. This Court therefore concludes that Aetna has established the second requirement *i.e.* that the parties intended a substitution of contract.

The third requirement is sufficient consideration. This Court finds that sufficient consideration existed as part of the overall transaction.

Paragraph 4 of the bond provides:

4. In the event of change in the legal entity of the Principal, the Principal shall immediately notify the Director of the Bureau of Workers' Compensation and the Surety agrees to notify forthwith the Director in writing of any such change as soon as it receives notice of any knowledge thereof; provided, however, the Surety shall not be liable for the obli-gations of the new entity unless it consents thereto in writing.
[*See*, Aetna's Documents 28, 29, 30].

Since a merger occurred and "legal entity of the Principal" had changed, Aetna could not be liable by virtue of the bond language for the obligations of the new entity, Jones & Laughlin Steel Incorporated. The consideration is found by virtue of Aetna's agreement to accept liability for the obligations of the new corporate entity in exchange for extinguishment of the three pre-existing bonds. The substitution of one unexecuted contract for another has been held to be adequate consideration. *Yoder v. T.F. Scholes, Inc.*, 173 A.2d at 122.

The correspondence between Jones & Laughlin, the Bureau, and Marsh & McLennan evidence the fourth requirement for a novation, consent. Particularly, the correspondence of September 8, 1981 [*see*, Aetna's Document 11], October 8, 1981 [*see*, Aetna's Document 13], and November 25, 1981 [*see*, Aetna's Document 17], in conjunction with Aetna's Surety Adjustment Reports support the conclusion that the Bureau and Jones & Laughlin/LTV not only consented to the replacement but actively sought it.

Some legal authorities impose a further requirement to establish novation. Those authorities require as an additional element, the inclusion of a party who neither owed the previous duty, nor was entitled to its performance. *See*, 15 *Williston on Contracts*, § 1865 (3rd ed. 1972). Even that potential requirement is met in this transaction by the change of principal. Prior to the issuance of bond No. 018 S 71955, no obligation was owed by Aetna on behalf of the merged corporation, the New J & L Steel Corporation, whose name was immediately changed to Jones & Laughlin Steel Incorporated. [*See*, Aetna's Document 37]. The addition of the new corporation as a principal fulfills any requirement that a new party be involved.

**B. The 1985 Transaction**

■ A similar analysis applies to the 1985 transaction. Prior to the 1985 merg-

er, Aetna had two surety bonds in place, bond No. 018 S 100071193 for Republic Steel and BCNR, and bond No. 018 S 71955 for Jones & Laughlin. In 1985, Jones & Laughlin and Republic merged forming LTV Steel Company, Inc. As a result of the merger, the penal sum of bond No. 018 S 71955 was increased to $27 million, the names of the principals were changed to reflect the new corporate entities, and bond No. 018 S 100071193 was "cancelled".

The displacement or extinguishment of bond No. 018 S 100071193 is well documented. On June 13, 1985, LTV wrote to Marsh & McLennan confirming the Bureau's agreement to cancel bond No. 018 S 100071193. [*See*, Aetna's Document 18]. The Bureau granted its approval, stating the reason as "Bond Replacement". [*See*, Aetna's Document 24]. The Bureau's letter of August 27, 1985, granted specific authority to make the change effective July 1, 1985 since there was "no need for overlapping coverage". [*See*, Aetna's Document 26]. The bond was cancelled and Aetna closed its bond file. [*See*, Aetna's Document 27]. The Bureau's correspondence, the affidavit of the Bureau Director, and other documents establish that bond No. 018 S 100071193 was displaced and extinguished.

Additionally, bond No. 018 S 71955 with its increased penal sum and change of principals satisfies the second element of a novation, the substitution of a new contract. The second element is further satisfied by the Bureau's employee, Charles W. Wilson's description of the transaction as a "bond replacement". [*See*, Aetna's Documents 24, 25]. As stated previously, the Bureau recognized that the terms "replacement" and "substitution" are synonymous. [*See*, Affidavit of Jan Smith at ¶ 3; *see also*, Affidavit of Reta Davis at ¶ 4]. Therefore, the substitution is established by the documents and affidavits of the Bureau's personnel.

The consideration for the novation or substituted contract is found in Aetna's agreement to accept the suretyship for the new corporate entities and with an increased penal sum. As discussed previous-

ly, under ¶ 4 of the bond a change in the legal entity of the principal relieves the surety from liability for obligations of the new entity. Aetna's agreement to provide the bond for the new corporate entities in the increased penal sum is clearly adequate consideration for the replacement and cancellation of bond No. 018 S 100071193. *See, Yoder v. T.F. Scholes, Inc.*, 173 A.2d at 122.

It is also clear that the parties consented to the substitution since it was instituted at the request of LTV in its meeting with the Bureau Director. The consent of the parties is documented in LTV's letter of June 13, 1985, [*see*, Aetna's Document 18]; approved by the Bureau's response on Aetna's notice of July 12, 1985, [*see*, Aetna's Document 24]; and confirmed by the Bureau's letter of August 27, 1985. [*See*, Aetna's Document 26].

Finally, the additional requirement for a novation which is sometimes included by certain authorities, *i.e.* that the new contract include a party who neither owed the previous duty nor was entitled to its performance, is likewise met. Prior to the 1985 transactions Aetna owed no duty on either bond to respond in the event of a default by LTV Steel Company, Inc. or LTV Steel Specialty Products Company. The addition of those two principals fulfills any requirement that an additional party be involved.

Based upon the correspondence and the other documents submitted, this Court finds that there are no genuine issues as to any material fact that the 1981 and 1985 transactions constituted a substituted contract and novation. The three pre-existing bonds were replaced with the express permission of the Bureau by bond No. 018 S 71955. It is clear that the parties intended that this new bond was substituted for the pre-existing bonds to maintain Jones & Laughlin's and subsequently, LTV Steel's self-insured status. Neither the Debtors nor the Bureau have produced any document which comports with the language of ¶ 3 of the bonds which would have clearly demonstrated that the parties intended to "terminate" the surety bonds. This

Court also finds that there was adequate consideration, that the parties consented to the substitution, and that the successor corporation was named as the new principal. There is nothing in the documents which supports the Debtors' assertion that either the 1981 or 1985 transactions constituted a "termination" within the meaning of the bond language. Accordingly, this Court finds that Aetna is liable only under its surety bond No. 018 S 71955 in the maximum penal sum of $27 million with respect to the Debtors' default on its Pennsylvania Workers' Compensation liability.

7) *Whether LTV Steel and the Bureau should be estopped from asserting Aetna's liability beyond the penal sum of $27 million.*

■ In the alternative, Aetna asserts that based on the doctrines of both equitable and promissory estoppel it is also entitled to summary judgment. Although this Court has already found sufficient grounds for the granting of summary judgement on behalf of Aetna on the theory of novation or substitution of contract, based on the documents and the affidavits submitted there is a sufficient basis for a finding of estoppel under these circumstances.[1]

The doctrine of equitable estoppel is one of fundamental fairness. *Brog Pharmacy v. Commonwealth, Department of Public Welfare*, 87 Pa.Cmwlth. 181, 487 A.2d 49, 52 (1985). Equitable estoppel is a defense which precludes a person from denying or asserting a claim. *Paul v. Lankenau Hospital*, 375 Pa.Super. 1, 543 A.2d 1148, 1152, app. den., 520 Pa. 618, 554 A.2d 510 (1988).

In Pennsylvania, the doctrine of equitable estoppel is well established:

Equitable 'estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief,

so that he will be prejudiced if the former is permitted to deny the existence of such facts.'

*Northwestern Nat'l Bank v. Commonwealth*, 345 Pa. 192, 27 A.2d 20, 23 (1942) (citations omitted); *accord, Blofsen v. Cutaiar*, 460 Pa. 411, 333 A.2d 841, 843–44 (1975); *Schuylkill Prods., Inc. v. H. Rupert & Sons, Inc.*, 305 Pa.Super. 36, 451 A.2d 229, 233 (1982); *Cerami v. Dignazio*, 283 Pa.Super. 424, 424 A.2d 881, 887–88 (1980).

The party asserting the estoppel must establish grounds therefore by "clear, precise and unequivocal evidence." *Blofsen v. Cutaiar*, 333 A.2d at 844; *accord Novelty Mills, Inc. v. Siskind*, 500 Pa. 432, 457 A.2d 502, 504 (1983).

Although similar, the doctrine of promissory estoppel is separate and distinct from the doctrine of equitable estoppel. Promissory estoppel is an independent cause of action. *Paul v. Lankenau Hospital*, 543 A.2d at 1153. This doctrine allows courts to enforce promises to remedy a manifest injustice. *Cardamone v. University of Pittsburgh*, 253 Pa.Super. 65, 74, 384 A.2d 1228, 1232 (1978). Promissory estoppel has long been recognized as a vehicle by which a promise may be enforced in order to remedy an injustice. *Travers v. Cameron County School District*, 117 Pa.Cmwlth. 606, 544 A.2d 547, 550 (1988).

These doctrines of estoppel can be applied against agencies of the Commonwealth. "[A]pplication of the doctrine of estoppel should not be denied merely because it is being asserted against the government." *Commonwealth, Department of Public Welfare v. UEC, Inc.*, 483 Pa. 503, 514, 397 A.2d 779, 785 (1979). Statements by compensation authorities which are misleading can operate as an estoppel. *Burgit v. Commonwealth, Unemployment Compensation Board of Review*, 97 Pa.Commw. 615, 511 A.2d 247, 248, app. den., 515 Pa.Cmwlth. 625, 531 A.2d 432 (1986). *See also, Commonwealth Department of Revenue v. King Crown*

---

1. Since Aetna has prevailed on its motion for summary judgment under the theories of novation and estoppel, there is no need to address Aetna's alternative theories for relief, *i.e.,* reformation and merger.

*Corp.*, 52 Pa.Cmwlth. 156, 415 A.2d 927 (1980) and *Central Dauphin School District v. Commonwealth, Department of Education*, 63 Pa.Cmwlth. 48, 437 A.2d 527 (1981).

A case directly on point which, parenthetically, involved the Bureau is *Utica Mutual Insurance Co. v. Commonwealth of Pennsylvania, Department of Labor and Industry, Bureau of Worker's Compensation*, slip op. No. 1759 (C.D. May 16, 1989). In *Utica Mutual*, the insurer, Utica Mutual, issued a bond on behalf of Mesta Machine Company in the penal sum of $2 million pursuant to the requirements of the Pennsylvania workers' compensation program. The Bureau, through the correspondence of Bureau Director, Jan Smith, agreed that Utica could reduce the penal sum of the bond from $2 million to $750,-000. Subsequently, the Bureau advised Utica that it was the Bureau's position that no reduction of the bond obligations had taken place, and that Utica would be held to the full amount of the $2 million surety bond. The Pennsylvania court rejected the Bureau's position, stating as follows:

> Whether the authority of Jan Smith to modify the surety agreement was actual or apparent, the Court believes that Utica justifiably relied on the authority of the Director of a State Agency to authorize modification of the surety bond. Utica cites *Commonwealth of Pennsylvania, Department of Revenue, Bureau of Sales and Use Tax v. King Crown Corporation*, 52 Pa.Commonwealth Ct. 156, 415 A.2d 927 (1980), for the proposition that justifiable reliance on the apparent authority of a government official may estop the Commonwealth from later denying the validity of his actions.... [T]he Court believes *King Crown* is applicable. Like the parties in *King Crown* who relied on the apparent authority of the assistant attorney general to approve a compromise tax settlement, we believe Utica justifiably relied on the authority of the Director of the Bureau of Workers' Compensation to approve modification of a surety bond.

> It would be unconscionable for the Commonwealth to deny the validity of reduc-tion agreement approved by the Director of a State Agency....

*Utica Mutual*, slip op. at 5.

Similarly, LTV and the Bureau should be estopped in the present matter. The undisputed material facts in this action satisfy the requirements under the doctrine of estoppel since the Bureau and J & L/LTV made representations and acted to induce action; Aetna reasonably relied on the Bureau's and J & L's/LTV's words, conduct and writings; and injustice would result by the failure to enforce the promises of the Bureau and J & L/LTV.

> Whenever a person has made to another person a written promise for which that other has given consideration or in reliance on which he has reasonably changed his position, the court in its interpretation of the words of that promise must take into account the intention and understanding of each of the two parties—the "meaning" attributed to the words by each of them. If they have inconsistent intentions and understandings, having given materially different interpretations to the words, no valid contract has been made unless the conduct of the promisor has been such that he is equitably estopped from asserting his own interpretation as against that given to his words by the promisee. A promisor may be legally bound in accordance with the promisee's intention and understanding if he actually knew or had reason to know such intention and understanding. The promisor is thus bound, not because the promisee's interpretation is the one and only true or objective interpretation of the written words, but because he knew or had reason to know the understanding of the promisee and permitted him to act in reliance thereon. In determining whether a promisor is bound by reason of his having had reason to know (without actual knowledge), his conduct must be considered in relation to all the circumstances of the case, including the customs and usages of other men in similar circumstances. Among these usages are the usages of words, as

reported in respectable dictionaries and testified to by competent witnesses.

A.L. Corbin, *The Interpretation of Words and the Parol Evidence Rule*, 50 Cornell L.Q. 161, 189–90 (1965).

This Court finds that even if it were to consider all of the affidavits submitted by the parties [2], a fair reading reveals a meager attempt to establish that the Bureau and LTV never intended to extinguish retroactive liability on the pre-merger bonds. However, their subjective intent does not prevent an estoppel where their conduct and statements, as clearly established by their own documents, misled Aetna.

Moreover, the representations by the Bureau's officials are noteworthy by what was not said. In other situations where the Commonwealth intended to continue retroactive liability on terminated bonds it had a deliberate policy of notifying the surety of its continuing liability. No such notice was provided in this case and no explanation for its absence has been offered. [*See*, Affidavit of Reta Davis, ¶¶ 3, 4, 5, 6]. Consequently, this Court finds that advising that the pre-merger bonds were "no longer required" and that the replacement bond would be "sufficient", in conjunction with the deviation from its standard practice of advising sureties of "continuing liability", constitutes misleading words, conduct or silence which induced Aetna to issue the replacement bond. Such conduct clearly satisfies the requirements of both equitable and promissory estoppel.

Additionally, this Court finds that Aetna was justified in relying upon the behavior and representations of LTV Steel and the Bureau when it issued the replacement bonds. The representations and dealings were by individuals in positions of authority. Robert C. Conner was the Manager–Insurance for J & L/LTV; Reta Davis was the Manager of Self–Insurance Section of the Bureau; and Jan Smith was the Director of the Bureau. Indeed, the Bureau has been estopped in similar circumstances.

*See, In re Utica Mutual Insurance Co. v. Commonwealth of Pa.*, slip op., *supra.*

Based upon the correspondence and the other documents submitted, including the affidavits submitted by both parties, this Court holds that there are no genuine issues as to any material fact that Aetna has met both the factual and legal requirements for a finding of both equitable or promissory estoppel. Accordingly, both the Debtors and the Bureau are estopped from asserting that Aetna is liable beyond the penal sum of $27 million under the surety bond No. 018 S 71955.

## CONCLUSION

In accordance with the foregoing discussion, Aetna's motions to dismiss are hereby denied.

Moreover, this Court concludes that surety bonds Nos. 018 S 69174, 018 S 69175, 018 S 68212 and 018 S 100071193 have been replaced and not "terminated". Thus, only surety bond No. 018 S 71955 in the maximum penal sum of $27 million is available with respect to the Debtors' default on its Pennsylvania workers' compensation liability. Consequently, the Debtors' motion for partial summary judgment is hereby denied and Aetna's cross-motion for summary judgment is hereby granted [3].

A separate *Report And Recommendation On Motion For Abstention* has been simultaneously entered.

Submit an order in accordance with the foregoing.

---

**2.** *See,* discussion herein at 904–905.

**3.** Accordingly, based on this Court's holding that Aetna is not liable beyond the penal sum of $27

million, the Debtors' request for reimbursement by Aetna pursuant to the third cause of action in their complaint is moot.